APANI SOUTHWEST, INC., Plaintiff,

v.

COCA–COLA ENTERPRISES,
INC., Defendant.

No. CIV.A.5:00–CV–228–C.

United States District Court,
N.D. Texas,
Lubbock Division.

Jan. 8, 2001.

Harold H. Pigg, Clifford, Field, Krier, Manning, Stone & Wilkerson, P.C., Lubbock, TX, for plaintiff.

William J. Wade and Matt D. Matzner, Crenshaw, Dupree & Milam, L.L.P., Lubbock, TX, Jerry L. Beane & Kay Lynn Brumbaugh, Strasburger & Price, L.L.P., Dallas, TX, for defendant.

## ORDER

CUMMINGS, District Judge.

On this day the Court considered Defendant, Coca–Cola Enterprises, Inc.'s ("Coke") Motion to Dismiss, filed August 23, 2000. Plaintiff, Apani Southwest, Inc. ("Apani") filed a Response to the Motion to Dismiss on September 12, 2000. Coke filed a Reply to Apani's Response to the Motion to Dismiss on September 23, 2000. Apani submitted a letter to the Court in response to Coke's Reply to the Motion to Dismiss on October 17, 2000, which was not considered by the Court as leave was not granted to file a surreply and such letter was not in proper format for consideration by the Court. Also considered by the Court is Apani's Motion for Leave to Amend, filed October 27, 2000. Coke filed a Response to the Motion for Leave to Amend on November 13, 2000. After considering all of the relevant argument and evidence, the Court **GRANTS** Coke's Motion to Dismiss with regard to all of Apani's antitrust claims and **DENIES** Coke's Motion to Dismiss with regard to Apani's tortious-interference claim. The Court **GRANTS** Apani's Motion for Leave to Amend and orders Apani to show cause, on or before 9:00 a.m. on January 19, 2001, why its tortious-interference claim should not be dismissed for lack of jurisdiction.

## I.

## BACKGROUND

Apani is a manufacturer of purified bottled water operating in and around the Lubbock, Texas area. Prior to the events in question Apani had developed a business relationship with the City of Lubbock ("the City") to supply private-label water to City facilities. On August 26, 1999, however, the City of Lubbock entered a contractual agreement with Coke to supply beverages to all City facilities and precluding the City from purchasing beverages from other parties, effectively eliminating the City's business relationship with Apani.

In response, Apani filed the instant suit alleging violations of § 3 of the Clayton Act, violations of the Texas Free Enterprise and Antitrust Act, and tortious interference with a business relationship. Coke subsequently filed the instant Motion to Dismiss. .

## II.

## STANDARD

### A. Generally

Under Federal Rule of Civil Procedure 12(b)(6), motions to dismiss raise the defense of failure to state a claim upon which relief may be granted.. This motion is appropriate when the defendant or counter-plaintiff attacks the complaint because it fails to state a legally cognizable claim. In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1137 (5th Cir.1992).

While this motion is often filed before the first responsive pleadings of the defendant, it is not waived if it is not filed in the answer or pre-answer stage. FED. R. CIV. P. 12(h)(2).

The test for determining the sufficiency of a complaint under Rule 12(b)(6) was set out by the United States Supreme Court in *Conley v. Gibson:*

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Grisham v. United States,* 103 F.3d 24, 25–26 (5th Cir.1997).

The *Conley* test is a rigorous standard, but subsumed within it is the requirement that the plaintiff state its case with enough clarity to enable a court or an opposing

party to determine whether a claim is sufficiently alleged. *Elliott v. Foufas,* 867 F.2d 877, 880 (5th Cir.1989).

In a Rule 12(b)(6) motion to dismiss, the allegations of the complaint must be taken as true. *Grisham,* 103 F.3d at 25. Further, the allegations in the complaint should be construed favorably to the pleader. *Oppenheimer v. Prudential Securities, Inc.,* 94 F.3d 189, 194 (5th Cir. 1996). This requirement is consistent with the well-established policy that the plaintiff be given every opportunity to state a claim. *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir.1977).

## B. Antitrust Market Definition

■ Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997)(affirming district court's dismissal of claim for failure to plead relevant market; proposed relevant market defined too narrowly); *TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *Tower Air, Inc. v. Federal Exp. Corp.,* 956 F.Supp. 270 (E.D.N.Y.1996) ("Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162 (S.D.N.Y. 1995) (dismissal for failure to plead a valid relevant market; plaintiffs failed to define market in terms of reasonable interchangeability or explain rationale underlying narrow proposed market definition); *Re–Alco Industries, Inc. v. Nat'l Center for Health Educ., Inc.,* 812 F.Supp. 387 (S.D.N.Y.1993) (dismissal for failure to plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or explain why product was not part of the larger market for health education materials); *E. & G. Gabriel v. Gabriel Bros., Inc.,* No. 93 Civ. 0894, 1994 WL 369147 (S.D.N.Y.1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross-elasticity of demand).

## III.

## DISCUSSION

### A. Antitrust Violations

#### 1. Clayton Act Generally

Section 3 of the Clayton Act ("the Act") makes it an offense to sell or lease a "commodity" on the "condition, agreement or understanding" that the purchaser or lessee refrain from dealing with the seller's or lessor's competitors, if the effect may be to substantially lessen competition or tend to create a monopoly. HOLMES, WILLIAM C., ANTITRUST LAW HANDBOOK § 4.02 (1999 ed.). It provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate

upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14 (1997).

■ Private plaintiffs may enforce § 3 in the form of an injunction or through treble-damage actions for three times the amount of the injuries they sustain from a violation. HOLMES, WILLIAM C., ANTITRUST LAW HANDBOOK § 4.02 (1999 ed.). Two types of restrictions on competition may be challenged under § 3: tying restraints and exclusive-dealing arrangements. Tying restraints result from an arrangement where the availability of one commodity is conditioned upon purchase or rental of another commodity from the seller or upon the buyer's agreement not to deal with the seller's competitors in the tied item. *Id.* at § 4.02[2]. Exclusive dealing, in contrast, occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller. *Id.* at § 4.02[3].

■ To prove a violation under § 3 of the Act, a plaintiff must show the following: (1) that the violator is engaged in interstate commerce and that the alleged unlawful act occurred in the course of such interstate commerce, (2) the violation involved a contract for sale, a sale, or a lease, (3) that the agreement is for goods, wares, merchandise, machinery, supplies or other tangible commodities, (4) that the agreement was conditioned or made on the understanding that the buyer or lessee will not use or deal in the goods of a competitor of the seller or lessor, (5) that the probable effect of the agreement is to sub-

stantially lessen competition or create a monopoly. KINTNER, EARL W., FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 32.7 (1984); *Transource Int'l, Inc. v. Trinity Indus., Inc.,* 725 F.2d 274, 284 (5th Cir.1984).

■ The fifth element is the key to the analysis, and thus the Supreme Court has identified a three-part test to determine whether a tying or exclusive-dealing arrangement has the probable effect of substantially lessening competition. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." *Id.* at 327, 81 S.Ct. 623. Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.'" *Id.* That is, "the opportunities for other traders to enter into or remain in that market must be significantly limited . . . ." *Id.* at 328, 81 S.Ct. 623.

### a. Product Market

Two factors are considered in determining product market: the extent to which the defendant's product is "interchangeable in use" and the degree of "cross-elasticity of demand." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). To determine interchangeability, the use and function of the defendant's product are compared to that of another product. If purchasers can substitute the products for one another as to use, the products are likely in the same

product market, unless other factors indicate that the products are not truly in the same economic market. HOLMES, WILLIAM C., ANTITRUST LAW HANDBOOK § 2.03[1] (1999 ed.). Cross-elasticity of demand considers the extent to which a change in the price of one product will alter demand for another product. If there is a substantial interaction between the two, such that a slight change in the price of one will significantly affect the demand for the other, then both products will be included in the same market. HOLMES, WILLIAM C., ANTITRUST LAW HANDBOOK § 2.03[1] (1999 ed.).

### b. Geographic Market

■ The geographic market is concerned with the area of "effective competition." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 575–76, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). "The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates and to which buyers can practicably turn for supplies." *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623. More specifically, the geographic market must " 'correspond to the commercial realities' of the industry and 'be economically significant.' " *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–337, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." *Id.* (quoting *American Crystal Sugar Co. v. Cuban–American Sugar Co.*, 152 F.Supp. 387, 398 (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir.1958)); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 452–56, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 592 F.Supp. 203, 212 (N.D.Tex.1984).[1]

Whether a geographic market corresponds to commercial realities takes into account practical considerations such as the size, cumbersomeness, and perishability of the products; the regulatory requirements impeding the free flow of competing goods into the area; shipping limitations inherent in the cost of transporting the products; and the area in which the defendant and its competitors view themselves as competing. HOLMES, WILLIAM C., ANTITRUST LAW HANDBOOK § 2.03[2] (1999 ed.); KINTNER, EARL W., FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.3 (1984); *See, e.g., Tampa Elec.*, 365 U.S. at 331–33, 81 S.Ct. 623; *Philadelphia Nat'l*, 374 U.S. at 357–62, 83 S.Ct. 1715; *United States v. General Dynamics Corp.*, 341 F.Supp. 534 (N.D.Ill. 1972), *aff'd*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Foremost Dairies, Inc.*, 60 F.T.C. 944 (1962); *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 669–671, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974).

Conversely, economic significance does not depend upon singular elements such as population, income, political boundaries, or geographic extent, but rather upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area. KINTNER, EARL W., FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.2 (1984)(quoting S. REP. NO. 1775, n. 21 (1950), U.S.Code Cong.Serv. 1950, p. 4293); *Brown Shoe*, 370 U.S. at 336, 82 S.Ct. 1502. To be economically significant, an area must contain an "appreciable segment of the product market." *Id.* (quoting S. REP. NO. 1775, n. 21

---

1. Note, the tests for determining geographic market under §§ 3 and 7 of the Act are similar. *Brown Shoe*, 370 U.S. at 329, 82 S.Ct. 1502; *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 366, 83 S.Ct. 1715, 10

L.Ed.2d 915 (1963). Thus, cases determining geographic area under § 7 are equally applicable to cases brought under § 3. *Id.* at 329–330, 83 S.Ct. 1715.

(1950)). Whether a segment is "appreciable" depends upon whether it includes either an appreciable proportion of the product market as a whole, or a proportion of the product market which is "largely segregated from, independent of, or not affected by" competition elsewhere. *Id.* (quoting S. REP. NO. 1775, n. 21 (1950)). Thus, an area need not include a large percentage of all business activity in the relevant product market to qualify as being economically significant. *Id.* An area may contain a small percentage of business activity as long as relevant competition within the area is insulated from similar competition elsewhere. *Id.*

### c. Foreclosure of Competition

For a tying or exclusive-dealing arrangement to be illegal under § 3 of the Act, it must foreclose competition in a substantial share of the above-defined relevant market. *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623. Opportunities for sellers other than the defendant must be significantly limited. *See id.* at 328, 81 S.Ct. 623.

To determine whether the foreclosed competition is "substantial," courts must look at "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which preemption of that share of the market might have on effective competition therein." *Id.* at 329, 81 S.Ct. 623; *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.1981).

Courts have applied two tests to determine when exclusive-dealing arrangements have a substantial impact on the market. The first was identified by the Supreme Court in *Standard Oil Co. of Calif. & Standard Stations v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). In *Standard Stations*, the Supreme Court adopted what came to be known as the "quantitative-substantiality"

test. *See* KINTNER, EARL W., FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 32.53 (1984). Under the quantitative test, courts consider the percentage of the relevant market foreclosed, with no need to show actual or potential economic effects in the market. *Standard Stations*, 337 U.S. at 304, 313–14, 69 S.Ct. 1051. The Court stated that it would weigh not only the percentage of the market foreclosed as laid out in *Standard Stations*, but also it would "weigh the probable effect of the contract on the relevant area of effective competition ... and the probable immediate and future effects which preemption of that share of the market might have on the effect of competition therein." *Id.*

The second test was applied to § 3 violations of the Act by the Supreme Court in *Tampa Elec.* and has come to be known as the "qualitative-substantiality" test. *Tampa Elec.*, 365 U.S. at 328–29, 81 S.Ct. 623; *See* KINTNER, EARL W., FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 32.54 (1984). Considerations under the "qualitative substantiality test include percentage of market foreclosed by defendant, barriers to entry, terms of the agreement regarding duration, ability to terminate the agreement, other available distribution channels, whether the purchaser is an end user, the nature of the product, actual competitive impacts, justifications, and the seller's market power." *See* Arthur I. Cantor, *Tying, Exclusive Dealing, and Franchising Issues*, Practicing Law Institute Corporate Law and Practice Course Handbook Series, 1101–1108 (May 2000).

Since the *Tampa Elec.* decision, many courts, including the Fifth Circuit, have applied the qualitative-substantiality test to claims of violation of § 3 of the Act. *See, generally, Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253 (5th Cir.1988); *Barr Lab., Inc. v. Abbott Lab.,*

978 F.2d 98 (3d Cir.1992); *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380 (7th Cir.1984); Advanced *Health–Care Serv. v. Radford Comm. Hosp.,* 910 F.2d 139 (4th Cir.1990). Therefore, the Court will analyze Apani's claims under the qualitative-substantiality test.

## 2. Texas Free Enterprise Antitrust Act Generally

The Texas Free Enterprise and Antitrust Act ("TFEAA") was passed by the Texas legislature in 1984 to provide the State of Texas with its own antitrust laws. Tex. Bus. & Comm.Code §§ 15.01 et seq. (Vernon 1987). Each provision of the Texas Act is mirrored after a corresponding provision of federal antitrust law. *Shipper v. American Auto. Ass'n,* 1997 WL 135672, *5–*6 (N.D.Tex.1997); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1388 (5th Cir.1994); *Caller–Times Pub. Co., Inc. v. Triad Communications, Inc.,* 826 S.W.2d 576 (Tex.1992). As such, Texas courts are statutorily instructed to follow federal precedent to assist them in interpreting the TFEAA. Tex. Bus. & Comm.Code § 15.04. Thus Texas courts have adopted federal standards for determinations of violations of the TFEAA including the use of relevant market to determine whether substantial reductions in competition have occurred. *See Shipper v. American Auto. Ass'n,* 1997 WL 135672, *5–*6 (N.D.Tex.1997); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1388 (5th Cir.1994); *Caller–Times Pub. Co., Inc. v. Triad Communications, Inc.,* 826 S.W.2d 576 (Tex.1992).

In light of this overlap, the Court's analysis of Apani's claims under the Clayton Act shall be equally applicable to Apani's claims under section 15.05(c) of the Texas

Business and Commerce Code, which mirrors § 3 of the Clayton Act.

## 3. Failure to Allege Antitrust Injury

■ As part of the determination of whether a party has standing to bring an antitrust claim, courts must determine whether the plaintiff has alleged antitrust injury, meaning "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants[ ] acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488–89, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *T.O. Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1182 (5th Cir.1988)("Proving antitrust injury is a necessary requirement for proving standing; the former cannot stand alone from the latter"). Broken into two separate elements, antitrust injury requires a showing that: (1) the injury was of the type antitrust laws were intended to prevent, and (2) that the injury "flows" or was caused by that which makes the defendant's conduct unlawful.[2]

After the *Brunswick* decision, the Fifth Circuit clarified the elements of the antitrust-injury inquiry. In *Multiflex, Inc. v. Samuel Moore & Co.,* the court distinguished antitrust injury from injury to competition. 709 F.2d 980, 986 n. 6 (5th Cir.1983). Subsequently, in *Walker v. U–Haul Co.,* the court determined that plaintiffs are not required to establish a market-wide injury to competition as an element of standing. 747 F.2d 1011, 1016 (5th Cir.1984).

In its most recent pronouncement on antitrust injury, the Fifth Circuit reasoned that antitrust injury for standing purposes "must be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on

**2.** The holding in *Brunswick,* which involved a violation of section 7 of the Clayton Act, has been accorded broader application. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (applying *Brunswick* to violations of section 2(a) of the Clayton Act); *Associated*

*General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)(applying *Brunswick* to section 1 of the Sherman Act); *see also Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980 (5th Cir.1983)(applying *Brunswick* to section 2 of the Sherman Act).

overall competition." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997). Holding that the district court erred in finding that injury to competition was a prerequisite to antitrust injury, the Fifth Circuit in *Doctor's Hospital* reiterated and clarified the distinction between antitrust injury and injury to competition. The court, quoting Professors Areeda and Hovenkamp, stated that

> '[a]n increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government—which enjoys automatic standing—must be dismissed.'

*Id.* at 306 (quoting PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 360f, at 202–03 (rev. ed.1995)).

Coke argues that Apani has failed to allege antitrust injury because Apani's allegations reflect only claims of injury to itself. Coke reiterates the requirement of injury to competition, arguing, apparently, that because Apani has only alleged injury to itself, it has not sufficiently alleged a substantial injury to competition in the relevant market. *See Tampa Elec.,* 365 U.S. at 327, 81 S.Ct. 623. The Court finds that Coke's argument does not represent an attack on Apani's standing to sue or a challenge to antitrust injury, but rather a challenge to Apani's allegation of a claim upon which relief may be granted.

Coke cites to *Brunswick* for the proposition that antitrust laws were enacted for the "protection of competition, not competitors." *Brunswick,* 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe,* 370 U.S. 294, 82 S.Ct. 1502). Then Coke refers to the *Brunswick* test for determining whether antitrust injury exists and surmises that Apani has no antitrust injury because it only alleges injuries to itself. However, Apani's allegation of injury only to itself has nothing to do with whether it meets the requirements of antitrust injury. Nonetheless, the Court will determine whether Apani has standing to bring its antitrust claims.

The first requirement of the antitrust-injury analysis requires that plaintiff's injury be of the type which the antitrust laws were intended to prevent. *See id.* at 489, 97 S.Ct. 690. Section 3 of the Clayton Act protects competitors from injuries resulting from exclusive-dealing arrangements where parties agree that the buyer may not purchase the commodities subject to the arrangement from competitors of the seller. Apani, a competitor of Coke, was prevented, as the result of an exclusive-dealing arrangement between Coke and the City of Lubbock, from selling its product at City of Lubbock facilities. The Court finds Apani's alleged injury was precisely of the type § 3 of the Clayton Act was designed to address.

The second requirement in the antitrust-injury analysis asks whether the injury flows from that which makes the defendant's acts unlawful. *Id.* In the instant action, Apani's injury flows from, or was caused by, the exclusive nature of the arrangement made between Coke and the City of Lubbock. Had the agreement not been exclusive, Apani might have been able to sell its product at City facilities alongside Coke's products. Thus, the Court finds that Apani's alleged injury flows from the conduct of Coke and meets the second *Brunswick* requirement.

The determination that Apani has alleged adequate antitrust injury does not affect, and is not affected by, the Court's further determination that Apani has

failed to state a claim upon which relief may be granted. The Court has simply followed the analysis set forth by the Fifth Circuit distinguishing violations of antitrust law from the antitrust-injury determination.

Finally, the Court finds Coke's substantive argument against Apani's allegation of injury also fails. Simply because Apani has only alleged injury to itself does not mean that it has failed to allege substantial injury to competition. According to Apani's allegations, the exclusive-dealing arrangement between Coke and the City of Lubbock totally precluded competition within Apani's defined relevant market. If accepted as true, such allegation would cause a substantial injury to competition.

### 4. Immunity

While § 3 of the Act makes it an offense to sell commodities on condition that the buyer refrain from dealing with other sellers when the effect of such agreement substantially lessens competition, nothing on its face qualifies its reach to states or expressly regulates states. In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), however, the Supreme Court found that Congress had not made clear its intent to intrude on the sovereign powers of the states by subjecting their decisions to the constraints of the federal antitrust laws, and therefore precluded antitrust law from application to states. "State-action immunity" is more accurately a strict standard for locating the reach of the Sherman Act than the judicial creation of a defense to liability for its violation. The Clayton Act does not reach states. *See Surgical Care Ctr. of Hammond, L.C. v. Hospital Serv. Dist. No. 1 of Tangipahoa Parish,* 171 F.3d 231, 234 (5th Cir.1999)(en banc). Thus, what has come to be known as "state-action immunity" is not really immunity but rather an exemption. *Id.* It does, however, function in certain important respects much like an immunity. *Id.* Like other immunities, *Parker* issues can often

be resolved at an early stage of the litigation. As Professors Areeda and Hovenkamp note, "State authorization is generally interpreted by an objective test that looks at the language of the statute; if other evidence is needed, it can be gleaned from legislative histories or state judicial decisions." *Id.* (quoting PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 222b (1997)). Thus, it ordinarily produces a legal conclusion reviewed de novo. *See, e.g., Bolt v. Halifax Hosp. Med. Ctr.,* 980 F.2d 1381, 1384 (11th Cir.1993).

Creatures of states, organized to provide local government, such as hospital districts and municipalities, however, are not sovereign states and are not necessarily beyond the reach of federal antitrust laws. *See Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). States, however, exercise their sovereign power in creating local entities for local government. As an incident of sovereignty, a state may govern directly or through its creatures, clothing them with the attributes and authority it chooses, including, if it desires, insulation from the Sherman and Clayton Acts. Thus, municipalities and other political subdivisions, while they are not automatically immune under *Parker* because they are not sovereign, are entitled to immunity when they act pursuant to a clearly articulated and affirmatively expressed state policy displacing competition. *See id.* at 38, 45–46, 105 S.Ct. 1713.

In addition to protecting municipalities under some circumstances, the Supreme Court has extended state-action immunity to protect private individuals from liability for activities that might otherwise violate federal antitrust law. *See, e.g., Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). When the *Parker* exemption is invoked by a defendant other than the state, however, the allegedly anticompetitive activity is subjected to greater scrutiny before state-

action immunity will be granted. *See Hoover v. Ronwin,* 466 U.S. 558, 569, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). In addition to the element required of municipalities—proving that the alleged anticompetitive conduct must have been taken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with state regulation—private individuals must also prove that the state actively supervised the implementation of its policy. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *DFW Metro Line Servs. v. Southwestern Bell Tel., Corp.,* 988 F.2d 601, 605 (5th Cir.1993). This two-pronged review is commonly known as the *Midcal* test.

The Court identified the reason for the distinction between municipalities and other defendants subjected to the *Midcal* test in *Town of Hallie,* stating:

> Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

471 U.S. at 47, 105 S.Ct. 1713.

After its decision in *Midcal,* the Supreme Court clarified the second required element in *FTC v. Ticor Title Ins.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). In *Ticor,* the Court held that " 'the mere presence of some state involvement or monitoring does not suffice.' " *Ticor,* 504 U.S. at 634, 112 S.Ct. 2169 (quoting *Patrick v. Burget,* 486 U.S. 94, 100–01, 108 S.Ct. 1658, 100 L.Ed.2d 83(1988)). Rather, the state supervision must be active; state officials must be vested with the power to review particular anti-competitive acts and to disapprove those actions that do not comply with state policy. *DFW Metro,* 988 F.2d at 606 (1993)(citing *Ticor,* 504 U.S. at 634, 112 S.Ct. 2169).

> [T]he purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties.

*Id.* (quoting *Ticor,* 504 U.S. at 634, 112 S.Ct. 2169).

In addition to the immunity provided by *Parker* and its progeny, Congress passed the Local Government Antitrust Act of 1984 ("LGAA"). 15 U.S.C. §§ 34–36 (1997). The LGAA was passed to provide immunity to local governments from recovery of damages under the Clayton Act, stating:

> No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 35(a) (1997).

Additionally, § 36(a) protects the actions of individuals:

> No damages, interest on damages, costs or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) in any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 36(a) (1997). To determine whether the actions of a person were

"based on" an "official action directed by a local government," courts must look to the *Parker* analysis of state-action immunity and subsequent cases interpreting it. H.R. CONF. REP. NO. 98–1158 (1984); *Crosby v. Hospital Auth. of Valdosta & Lowndes County,* 93 F.3d 1515, 1536 (11th Cir.1996). Thus, to determine whether the actions of a person are immune to damages under the LGAA, courts apply the test of *Midcal* and its progeny set out above. *See Crosby,* 93 F.3d at 1536.

 In the instant action, Coke claims both state-action immunity under *Midcal* and immunity under the LGAA. Coke supports its immunity claim by arguing that it meets both of the required elements for immunity under the *Midcal* test in that Lubbock is a home-rule City as authorized by the Texas Constitution and because the agreement between Coke and the City of Lubbock provides for the City to oversee operation of the agreement. Apani strongly contests Coke's argument, claiming that Coke cannot support either requirement of the *Midcal* test. The Court will consider each element individually.

In its claim for immunity, Coke is characterized as a private individual and thus must meet both prongs of the *Midcal* test. The first element requires that the alleged anticompetitive conduct must have been taken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with state regulation. *Midcal,* 445 U.S. at 105, 100 S.Ct. 937. Coke argues that this element is met in light of the fact that the City of Lubbock is a so-called "home-rule" city under the Texas Constitution and the Texas Local Government Code. TEX. CONST. art. XI, § 5; TEX. LOC. GOV'T CODE ANN. § 51.072. Coke argues that the City of Lubbock, as a home-rule city, has the power to contract and be contracted with and thus meets the first requirement of the *Midcal* test. The Court, however, cannot agree.

The test stated in *Midcal* requires a "clearly articulated" and "affirmatively ex-

pressed" state policy. *Midcal,* 445 U.S. at 105, 100 S.Ct. 937. The Texas Constitution provides local governments with the power to amend their charters, levy and assess taxes, and perform other acts consistent with the Constitution of the State of Texas. TEX. CONST. art. XI, § 5. Section 51.072, to which Coke further cites to support its argument, merely states "[t]he municipality has full power of local self-government." TEX. LOC. GOV'T CODE ANN. § 51.072. Nowhere within the Texas Constitution or the Local Government Code are local governments specifically provided with the power to contract and be contracted with specifically for the provision of amenities at local forums or otherwise.

The Supreme Court has found such ambiguous statements of authority insufficient to pass the first element of the *Midcal* test. In *Community Communications Co., Inc. v. City of Boulder, Colo.,* the Supreme Court considered the home-rule provision of the Colorado Constitution, which granted "the full right of self-government in both local and municipal matters" and made provisions virtually identical to the ones found in the current Texas Constitution upon which Coke relies. 455 U.S. 40, 43, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). The Court determined that "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere neutrality respecting the municipal actions ...." *Id.* at 55, 102 S.Ct. 835. Additionally, the Court stated that:

> A State that allows its municipalities to do as they please can hardly be said to have contemplated the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as comprehended within the powers granted, since the term, granted, necessarily implies an affirmative addressing of the subject by the State.

*Id.* (internal quotations omitted).

Thus, in light of the vague statement of authority in the Texas Constitution and

the Supreme Court's decision in *City of Boulder*, the Court finds that Coke fails to meet the first requirement of the *Midcal* test.

Similarly, Coke fails the second requirement of the *Midcal* test which requires that the state must actively supervise the implementation of its policy. *Midcal*, 445 U.S. at 105, 100 S.Ct. 937. Coke argues that the terms of the contract prove active state supervision. Coke points to provisions in the agreement which require the City and its administrators to oversee the operation of the agreement. While the agreement does provide for some supervision, it is inadequate and of the wrong type to support the second element of the *Midcal* test. First, *Midcal* requires that the *state* actively supervise the implementation of the policy. The supervision to which Coke points is done by the *City* and *City* administrators, not the state. Second, as stated by the Supreme Court in *Ticor* above, the purpose of the second prong of the *Midcal* test is to determine whether the state has exercised sufficient independent judgment and control so that the rates or prices influenced have been so as the result of deliberate state intervention, not simply agreement of private parties. *Ticor*, 504 U.S. at 634, 112 S.Ct. 2169. In the instant action, the power to supervise involves no state judgment and certainly is not the result of deliberate state intervention. It is, in fact, simply the agreement of private parties.

## 5. Definition of Geographic Markets

Apani, in both its original amended complaint and the proposed complaint for which it seeks leave to file, alleges a relevant geographic market consisting of 27 facilities owned by the City of Lubbock. Apani's proposed complaint provides additional detail regarding the activities held at the 27 locations, but does not propose a different relevant geographic market than in its original amended complaint. Coke challenges Apani's geographic market definition, arguing that the definition market

must fail as a matter of law, that the City is a "single purchaser," and that the 27 City of Lubbock facilities do not constitute a relevant geographic area. Apani responds by arguing that the determination of the relevant geographic market is essentially a fact question not susceptible to resolution by a motion to dismiss.

As described above, the relevant geographic market is concerned with the area of effective competition, specifically the market area in which a seller operates and in which a buyer can practically turn for supplies. The relevant geographic market in a particular case must correspond to the commercial realities of the industry and be economically significant. Despite the fact that the determination of relevant geographic market is necessarily fact-intensive, the Court finds Apani's market definition legally insufficient as a matter of law.

Whether a geographic area corresponds to the commercial realities of the industry requires analysis of the factors described *supra*. Considering each of these factors, the Court is unable to conclude that the relevant geographic market may be restricted to the 27 Lubbock facilities Apani suggests. Apani does business in and throughout Lubbock, Texas with customers including Texas Tech University. Thus, there is no restriction on Apani's geographic sales market by the size, cumbersomeness, and perishability of its bottled water that would merit restricting the geographic market to the 27 Lubbock facilities encompassed by the City's arrangement with Coke. Further, there is no regulatory requirement affecting Apani's ability to sell its product throughout Lubbock, Texas. Nor can the Court imagine an inherent shipping limitation placed upon Apani's product distribution that would support restricting the geographic market of competition to 27 City-owned facilities. Finally, and most telling, the Court finds that Apani does not view itself as competing solely for the supply of bottled water to the 27 Lubbock facilities in light of Apani's actual business with

other local customers. The Court cannot find, therefore, that Apani's relevant geographic market definition compares favorably with the commercial realities in the industry. Quite to the contrary, the Court finds that, at a minimum, the commercial realities of the industry suggest that the relevant geographic market must include all of Lubbock, Texas.

Turning to the second requirement of the relevant geographic market, economic significance, the Court must determine whether the geographic area contains an appreciable segment of the product market. KINTNER, EARL W., FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.2 (1984)(quoting S. REP. NO. 1775, n. 21 (1950)). Whether a segment is appreciable depends on whether the segment includes either an appreciable proportion of the product market as a whole, or a proportion of the product market largely segregated from, independent of, or not affected by, competition elsewhere. *Id.* The Court finds that competition for business with the 27 Lubbock facilities in question is not segregated or independent from competition elsewhere in Lubbock, Texas. No unique limitation on competition would suggest that competition for the City of Lubbock bottled water business is separate from competition for bottled water business elsewhere in the Lubbock, Texas bottled water market. Thus, Apani's geographic market definition also fails to meet the economic significance requirement for relevant geographic market.

Coke and Apani operate at a minimum within the City of Lubbock. A buyer such as the City of Lubbock could at least turn to any supplier within the Lubbock area for bottled water. Apani's relevant geographic market is insufficient as a matter of law.

Additionally, the Court finds no alternative proper geographic market under which Apani could recover. By attempting to limit the relevant geographic market to the 27 City of Lubbock facilities, Apani seeks to assume what it must prove—that there is a substantial reduction in competition in the relevant market. *See Jayco Sys., Inc. v. Savin Bus. Mach. Corp.,* 777 F.2d 306, 320 (5th Cir.1985). When the Court considers a wider relevant geographic market such as the City of Lubbock, or all public venues within the City of Lubbock, no substantial reduction in competition would exist, and therefore no cause of action upon which relief may be granted exists.

Apani's argument that the determination of the relevant geographic market is fact-intensive does not affect this outcome. The only way Apani can allege a geographic market in which the arrangement between Coke and the City of Lubbock would cause a significant injury to competition is to allege the narrow geographic market it alleges. If the geographic market is widened, as the Court considered above, no significant injury would occur. There is no set of facts under which Apani can recover; either the relevant geographic market is too small to meet the requirements set forth by the Supreme Court, or the injury to competition is not sufficiently significant to be a violation of the Act.

Coke also argues Apani's geographic market definition is insufficient as a matter of law because the City of Lubbock is a "single purchaser" within the meaning established by the Fifth Circuit in *Jayco Sys., Inc. v. Savin Bus. Mach. Corp.,* 777 F.2d 306, 320 (5th Cir.1985). In *Jayco,* the plaintiff, a distributor for a major copier manufacturer, sought to bid on a contract to provide copiers and service to the State of Texas. *Id.* at 312. The manufacturer chose instead to bid on the contract itself and was successful. *Id.* at 313. The plaintiff in *Jayco* then filed a lawsuit alleging violations of antitrust laws and attempting to define the relevant geographic market as the State of Texas copier business. *Id.* at 319. The Fifth Circuit found that the plaintiff had failed to state a relevant geographic market as a matter of

law. *Id.* at 320. The court reasoned that a "single purchaser" such as the State of Texas could not constitute a relevant geographic market. *Id.* Further, the court stated "we hazard the suggestion that a single purchaser could not be considered relevant market unless plaintiff made some showing of monopsony power."[3] *Id.* at 320, n. 46.

The Court finds Apani's asserted geographic market alleges a "single purchaser" within the meaning of *Jayco* and therefore, as a matter of law, has failed to properly define a relevant geographic market upon which relief may be granted. Apani's allegation that the relevant geographic market consists of 27 City of Lubbock facilities is analogous to the plaintiff's allegation in *Jayco*. Apani seeks to refute the "single-purchaser" conclusion by arguing that each of the 27 locations is separate. Considering the plain language of the agreement, this argument is simply not plausible. The City of Lubbock entered into an agreement with Coke to provide beverages at 27 locations. There is no suggestion that each facility agreed separately to purchase beverages from Coke. Apani alleges the single agreement between the City and Coke provides the basis for its § 3 claim. The Court concludes that the City of Lubbock is a "single purchaser," and following Fifth Circuit precedent, Apani's relevant geographic market fails as a matter of law.

**B. Tortious Interference with a Business Relationship**

■ Tortious interference encompasses two individual and distinct causes of action: interference with an existing contractual relationship and interference with a prospective contract or business relationship. In its amended complaint, Apani specifically alleges that Coke tortiously interfered with Apani's business relationship with the City of Lubbock. Coke seeks to dismiss the interference claim, alleging that Apani has failed to properly allege the elements of tortious interference with an existing contract and that Apani's claim is wholly dependent upon its antitrust claims, which Coke alleges fail as a matter of law.[4] The Court finds that both of Coke's arguments fail and therefore does not dismiss the claim.

■ Coke's first argument, that Apani has not sufficiently alleged the elements of its claim, fails because Apani has not alleged the claim Coke challenges. As stated above, tortious interference with a business relationship is a distinct cause of action from tortious interference with a contract, involving the proof of different elements. Coke correctly states that in alleging a "vague business relationship," Apani fails to make out a claim for tortious interference with an existing contract, which requires the allegation of the existence of a contract subject to interference. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426 (Tex.1997). As stated above however, Apani is not alleging tortious interference with an existing contract. Apani alleges tortious interference with a business relationship, which does not require the allegation of an existing contractual relationship.[5] For this reason, Coke's first argument fails to provide a

---

3. Monopsony refers to price fixing or monopolization by a single buyer. *In re Beef Industry Antitrust Litigation, MDL Docket No. 248,* 600 F.2d 1148 (5th Cir.1979).

4. The elements of tortious interference with an existing contract are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damages or losses. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426 (Tex.1997).

5. The elements of tortious interference with a business relationship are: (1) a reasonable probability that the parties would have entered into a contract or relationship; (2) an intentional and malicious act by which the defendant prevented the relationship from occurring, with the purpose of harming the plaintiff; (3) lack of privilege or justification of the defendant to do the act; and (4) actual harm or damage resulting from the defendant's interference. *Garner v. Corpus Christi Nat'l Bank,* 944 S.W.2d 469 (Tex.App.—Corpus Christi 1997, writ denied), *cert. denied,*

ground upon which Apani's claim may be dismissed.

Second, Coke argues that Apani's claim fails because it is dependent upon Apani's other antitrust causes of action, which Coke also alleges fail. The Court finds, however, that Apani's claim is not wholly dependent upon its antitrust claims and therefore may survive though Apani's antitrust claims fail. While Apani's argument that the exclusive-dealing arrangement between Coke and the City may not state a valid antitrust argument, it may nevertheless form the basis of a claim for tortious interference with a business relationship. Coke entered into an agreement with the City by which Coke may have prevented a relationship from developing between Apani and the City. The actions by Coke in establishing an exclusive-dealing arrangement may have been made with the intent to prevent or harm a relationship between the City and Apani. Furthermore, Coke's actions may have been done without privilege to act, and Apani has allegedly been injured as a result of the arrangement.

## IV.

### CONCLUSION

Because Apani's definition of the relevant geographic and product market does not support a violation of § 3 of the Clayton Act, Defendant's Motion to Dismiss is **GRANTED** with respect to all antitrust claims. Defendant's Motion to Dismiss is **DENIED** as to Apani's tortious-interference-with-a-business-relationship claim. Apani's Motion for Leave to Amend is **GRANTED,** and Apani is hereby ordered to show cause, on or before 9:00 a.m. on January 19, 2001, why its tortious-interference claim should not be dismissed for lack of jurisdiction. All relief not expressly granted is denied.

SO ORDERED.

525 U.S. 965, 119 S.Ct. 410, 142 L.Ed.2d 333 (1998).