Sykes v. Health Network Sols., Inc., 2017 NCBC 72.

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 2595

SUSAN SYKES d/b/a ADVANCED
CHIROPRACTIC AND HEALTH
CENTER; DAWN PATRICK; TROY
LYNN; LIFEWORKS ON LAKE
NORMAN, PLLC; BRENT BOST; and
BOST CHIROPRACTIC CLINIC, P.A.,

Plaintiffs,

v.

HEALTH NETWORK SOLUTIONS,
INC. f/k/a CHIROPRACTIC
NETWORK OF THE CAROLINAS,
INC.; MICHAEL BINDER; STEVEN
BINDER; ROBERT STROUD, JR.;
LARRY GROSMAN; MATTHEW
SCHMID; RALPH RANSONE;
JEFFREY K. BALDWIN; IRA RUBIN;
RICHARD ARMSTRONG; BRAD
BATCHELOR; JOHN SMITH; RICK
JACKSON; and MARK HOOPER,

Defendants.

**ORDER & OPINION**

1.     THIS MATTER is before the Court on (1) Defendants' Motion for Partial Summary Judgment, (2) Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint ("Motion to Dismiss"), and (3) Plaintiffs' Motion for Consideration of Additional Authorities (collectively the "Motions").

*Oak City Law LLP, by Robert E. Fields III and Samuel Piñero II, Craige Jenkins Liipfert & Walker LLP, by Ellis B. Drew III and Leon E. Porter, and Doughton Blancato PLLC, by William A. Blancato, for Plaintiffs.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Jennifer K. Van Zant, W. Michael Dowling, and Benjamin R. Norman, for Defendants.*

Gale, Chief Judge.

## I.    INTRODUCTION

2.      Four North Carolina-licensed chiropractors and their affiliated practices assert this putative class action against Health Network Solutions, Inc. ("HNS") and its owners.  HNS manages the largest network of chiropractors in North Carolina. HNS contracts with insurance companies and third-party payors to arrange chiropractic services for the insurers' subscribers.  HNS contracts with chiropractors for these services on the condition that an HNS member may be terminated from the network if her average cost per patient exceeds a certain benchmark average. Chiropractors who contract with HNS are considered "in network" with the insurers that contract with HNS.

3.      Plaintiffs bring a number of claims based on their central allegation that the review process that HNS uses to monitor the costs of its members' services unlawfully restricts the output of medically necessary chiropractic services and is premised on an improper utilization review prohibited by the North Carolina Insurance Code.  They claim that HNS has achieved this output restriction by illegally conspiring with insurers to exercise their combined market power.  In a separate case pending before this Court, Plaintiffs assert related claims against the insurance companies and third-party payors that contract with HNS.  *See Sykes v. Blue Cross & Blue Shield of N.C.* (*Sykes II*), No. 15 CVS 3136 (N.C. Super. Ct. filed May 26, 2015).

4. After denying Defendants' initial motion to dismiss in 2013, the Court allowed full discovery on the limited issue of how to define the relevant market for Plaintiffs' antitrust claims. Defendants now seek summary judgment on Plaintiffs' antitrust claims and on the other claims that derive from the antitrust claims on the ground that Plaintiffs have failed to plead or forecast evidence adequate to prove a cognizable relevant product market in which Defendants participate. Defendants further challenge all claims alleged in the Second Amended Class Action Complaint ("Second Amended Complaint") under Rule 12(b)(6), and one claim under Rule 12(b)(1).

5. For the reasons discussed below, Plaintiffs' Motion for Consideration of Additional Authorities is DENIED AS MOOT, Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART, and Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The Court requests supplemental briefing and reserves ruling on the issue whether Plaintiffs have adequately pleaded market power within the market that the Court now accepts.

## II. PROCEDURAL HISTORY

6. Plaintiffs initiated this action on April 30, 2013. Defendants timely filed a notice of designation on May 30, 2013, and the case was designated as a mandatory complex business case on May 31, 2013, and assigned to the undersigned on June 7, 2013.

7.     Plaintiffs filed their first amended complaint on July 28, 2013. In its order denying Defendants' motion to dismiss that complaint, the Court expressed concern about whether Plaintiffs had adequately defined the alleged relevant market on which they seek to premise their antitrust claims. *See Sykes v. Health Network Sols., Inc.* (*Sykes I*), No. 13 CVS 2595, 2013 NCBC LEXIS 52, at *3, *13–17 (N.C. Super. Ct. Dec. 5, 2013). The Court then stayed additional proceedings pending full discovery on market definition. *Id.* at *16–17.

8.     The parties conducted fact and expert discovery on market definition between February 2014 and August 2015. That discovery persuaded Plaintiffs to pursue claims against certain insurers and third-party payors that contract with HNS, including Blue Cross and Blue Shield of North Carolina ("Blue Cross"), Cigna Healthcare of North Carolina, Inc. ("Cigna"), MedCost, LLC ("MedCost"), and Healthgram, Inc. (collectively the "Insurers"). Plaintiffs filed their action against the Insurers on May 26, 2015. The Court has deferred consideration of Plaintiffs' request to consolidate the actions. *See Sykes II*, No. 15 CVS 3136 (N.C. Super. Ct. July 15, 2015), ECF No. 27; *Sykes I*, No. 13 CVS 2595 (N.C. Super. Ct. July 15, 2015), ECF No. 77.

9.     Plaintiffs filed their Second Amended Complaint in this action on July 16, 2015, alleging claims for (1) declaratory judgment, (2) price fixing, monopsony, and monopoly under N.C. Gen. Stat. §§ 75-1, -2, and -2.1, asserted as a single combined claim (the "antitrust claims"), (3) unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, (4) civil conspiracy, (5) breach of fiduciary duty, and

(6) punitive damages. The Second Amended Complaint alleges four separate product markets in support of Plaintiffs' antitrust claims.

10. Following market discovery, Defendants timely filed their Motion for Partial Summary Judgment and Motion to Dismiss. The Insurers separately moved to dismiss the complaint in *Sykes II*. The Court first heard oral argument on Defendants' Motion for Partial Summary Judgment, and later held a joint hearing on the motions to dismiss in both cases.

11. Defendants' Motion for Partial Summary Judgment contends that Plaintiffs have failed to demonstrate a relevant product market in which Defendants participate. Defendants contend that the inquiry as to market definition necessarily leads to the conclusion, as a matter of law, that Defendants do not have the requisite market power in any of the four alleged markets—even if those markets are legally cognizable.

12. Defendants' separate Motion to Dismiss attacks the sufficiency of all claims alleged in the Second Amended Complaint. First, overlapping their summary-judgment argument, Defendants attack the antitrust claims under Rule 12(b)(6) on the ground that Plaintiffs do not allege a relevant market in which Defendants possess market power. Second, Defendants assert a Rule 12(b)(1) subject-matter jurisdiction challenge to Plaintiffs' claims related to chapter 58 violations, asserting that Plaintiffs lack standing to bring a private cause of action based on matters within the exclusive jurisdiction of the North Carolina Insurance Commissioner. Third, Defendants contend that Plaintiffs' section 75-1.1 claim, in addition to depending on

the flawed antitrust claims, is barred by the learned-profession exemption. Fourth, Defendants challenge any remaining claim under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

### III.  FACTUAL BACKGROUND

13.  The Court does not make findings of fact in ruling on the Motions, but summarizes the relevant underlying facts to provide context for its ruling.

#### A.  The Parties

##### (1)  Plaintiffs

14.  The named Plaintiffs are four licensed North Carolina chiropractors and their affiliated practices, three of which are former members of HNS. (Second Am. Compl. ¶¶ 141–44.)

15.  Plaintiff Susan Sykes is a former HNS member who does business under the name Advanced Chiropractic and Health Center. (Second Am. Compl. ¶ 3.) Dr. Sykes was terminated from HNS's network in May 2012 because her average cost per patient exceeded HNS's benchmark threshold. (Second Am. Compl. ¶ 141; Sykes Dep. 63:21, 63:25–64:3.)

16.  Plaintiff Dawn Patrick resigned from HNS's network in or around March 2012 after facing termination because of her average per-patient treatment cost. (Second Am. Compl. ¶ 142; Patrick Dep. 21:9–13, 68:10–11.) Dr. Patrick previously practiced chiropractic in North Carolina at Lifeworks on Lake Norman, PLLC ("Lifeworks"). (Second Am. Compl. ¶ 4.) She no longer practices chiropractic in North Carolina, but practices part-time at Total Health Solutions, a South

Carolina business owned by her husband, Plaintiff Jamie Troy Lynn ("Dr. Lynn"). (Patrick Dep. 21:8, 15–23.)

17. Dr. Lynn practices chiropractic in North Carolina at Lifeworks. (Second Am. Compl. ¶ 5.) Dr. Lynn was terminated from HNS's network in 2013 because of his average per-patient treatment cost. (Second Am. Compl. ¶ 143; Lynn Dep. 59:12–17.) The Court denied Dr. Lynn's motion to enjoin his termination. *Sykes I*, 2013 NCBC LEXIS 50, at \*69 (N.C. Super. Ct. Nov. 25, 2013).

18. Plaintiff Brent Bost practices chiropractic in North Carolina at Bost Chiropractic Clinic, P.A. (Second Am. Compl. ¶ 6.) Dr. Bost has never been an HNS member but claims that he was denied entry into the network in 1998. (Second Am. Compl. ¶ 144; Bost Dep. 25:12–17.)

19. The named Plaintiffs seek to represent a class consisting of "all licensed chiropractors practicing in North Carolina from 2005 to the present who provided services in the North Carolina Market," excluding HNS's owners "and any chiropractors in their employ or practicing through a professional corporation, a professional partnership or a professional limited liability company in which any of the HNS Owners are owners." (Second Am. Compl. ¶ 47.) Plaintiffs allege that each class member was either excluded from in-network access to the Insurers' patients, charged fees and subjected to HNS's utilization-review process, or both. (Second Am. Compl. ¶ 48.)

**(2)      Defendants**

20.    HNS, formerly known as Chiropractic Network of the Carolinas, Inc., is a North Carolina corporation with its principal place of business in Cornelius, North Carolina.  (Second Am. Compl. ¶¶ 7, 84.)  HNS manages a network of chiropractors whose members include approximately half of the estimated 1,990 active chiropractors licensed in North Carolina.  (Second Am. Compl. ¶¶ 28–29; McCormick Dep. Ex. 72 ("McCormick Report"), ¶ 32.)

21.    Defendants Michael Binder, Steven Binder, Robert Stroud, Jr., Larry Grosman, Matthew Schmid, Ralph Ransone, Jeffrey K. Baldwin, Ira Rubin, Richard Armstrong, Brad Batchelor, John Smith, Rick Jackson, and Mark Hooper (collectively the "Individual Defendants") are chiropractors who either practice, or formerly practiced, chiropractic in North Carolina, and who own, or previously owned, an interest in HNS.  (Second Am. Compl. ¶ 26.)

**B.      HNS's Business Structure**

22.    HNS is an integrated independent-practice association ("IPA") made up of a network of chiropractors.  (P. Binder Aff. ¶ 3, Sept. 30, 2013; P. Binder Dep. 17:5–7, 12–13; Second Am. Compl. ¶¶ 57, 74.)  Chiropractors join HNS's network by entering into a Practitioner's Participation Agreement ("PPA").  (P. Binder Aff. ¶ 3, Sept. 30, 2013.)  HNS markets its network of chiropractors to managed-care insurance companies.  (P. Binder Dep. 17:5–7, 13–14.)  Chiropractors who sign the PPA are "in-network" with the Insurers and other insurance companies and third-party payors that have contracted with HNS.

23. HNS negotiates with the insurance companies to establish reimbursement rates for its network of participating chiropractors, and network members provide chiropractic services to the insurers' subscribers. (P. Binder Aff. ¶ 4, Sept. 30, 2013.) HNS processes all reimbursement claims for its members for services they provide to the insurance companies' subscribers, and HNS retains a percentage of those payments. (Second Am. Compl. ¶¶ 61, 64; P. Binder Aff. ¶ 5, Sept. 30, 2013.) HNS also offers credentialing functions, including background checks, consultations with malpractice carriers, and other measures to ensure that its members are properly licensed and meet established criteria. (P. Binder Aff. ¶ 6, Sept. 30, 2013.)

### (1) HNS's Quality Management and Improvement Plan

24. As a condition of network membership, HNS members agree to participate in the HNS Quality Management and Improvement ("QMI") plan, which HNS claims is designed to control costs and improve provider efficiency. (P. Binder Dep. 17:20–23; P. Binder Aff. ¶ 7, Sept. 30, 2013.) A key component of the QMI plan is the Utilization Management ("UM") program. (P. Binder Aff. ¶ 8, Sept. 30, 2013; *see* P. Binder Aff. Ex. A, Sept. 30, 2013.) Under the UM program, the average cost per patient and the average number of patient visits for each chiropractor in HNS's network are compared to a network benchmark. (P. Binder Aff. Ex. A, at 4, Sept. 30, 2013.) A member whose average cost per patient is greater than 150% of the network's average cost per patient faces probation or potential termination from HNS's network. (Second Am. Compl. ¶ 100; Argue Dep. 61:10–14.)

25. The UM program is designed to measure a chiropractor's average cost per patient without considering the medical necessity of the care provided. (P. Binder Aff. Ex. A, at 2, 4, 19, Sept. 30, 2013; P. Binder Aff. ¶ 11, Sept. 30, 2013.) HNS describes the UM program as "a review and statistical analysis of practice patterns and a comparison to the collective practice patterns of the entire HNS physician network." (P. Binder Aff. Ex. A, at 2, 19, Sept. 30, 2013.) HNS's appeals process allows a network chiropractor who is placed on probation and subject to termination to raise considerations of medical necessity, including unique needs of the chiropractor's patient population that may require more expensive treatment that affects the member's overall average cost of care. (Argue Dep. 67:3–25; McCormick Dep. 155:20–25.)

C.   **Plaintiffs' Challenge to HNS's Network Structure**

26. To support their position that HNS controls chiropractic services in North Carolina, Plaintiffs emphasize that it is critical that a chiropractor have the ability to treat patients on an in-network basis. They claim that, as a result of its control over chiropractic services, HNS is able to use the UM program to punish chiropractors with a high-need patient population and "reduce the amount of chiropractic services in North Carolina for [HNS's] own benefit," (Second Am. Compl. ¶ 122,) equating to an abuse of monopsony power—buyer-side market power—as a buyer of chiropractic services, (Second Am. Compl. ¶¶ 108, 151(j), 158.)

27. Plaintiffs allege that HNS draws upon the Insurers' power to control access to the insured-patient population and, through its managed-care contracts,

enables "the Insurers to avoid paying for medically necessary and appropriate chiropractic care." (Second Am. Compl. ¶ 37.) Plaintiffs claim that "[t]he primary goal of HNS, the Insurers and the [Individual Defendants] was, and is, to maintain exclusivity with the Insurers using the strategy of artificially and illegally restricting total revenue to Providers, lowering the Insurers' costs, to preserve the Defendants' ability to receive payments from the Insurers, and to charge Providers a percentage of their reimbursement fees including co-pays." (Second Am. Compl. ¶ 123.)

28.     In addition to complaining of monopolistic and monopsonistic practices, Plaintiffs claim that HNS's network structure violates state insurance statutes and regulations controlling quality assurance and transcends prohibitions on unfair or deceptive trade practices.

## IV.     PLAINTIFFS' MOTION FOR CONSIDERATION OF ADDITIONAL AUTHORITIES

29.     Plaintiffs filed their Motion for Consideration of Additional Authorities after the hearing on Defendants' Motion for Partial Summary Judgment, and cite cases decided before that hearing. Pursuant to Business Court Rule 7.4, the Court elects to rule on Plaintiffs' Motion for Consideration of Additional Authorities without a hearing.

30.     Defendants correctly note that former Business Court Rule 15.9 and Rule 7.9 of the newly amended rules—which became effective after the motion was filed—limit suggestions of additional authorities to those subsequently decided. *See* N.C. Bus. Ct. R. 7.9 (2017) ("In connection with a pending motion, a party may file a

suggestion of subsequently decided authority after briefing has closed. . . . The suggestion may contain a brief explanation, not to exceed one hundred words, that describes the relevance of the authority to the pending motion."); *id*. R. 15.9 (2006) ("[A] suggestion of subsequently decided controlling authority, without argument, may be filed at any time prior to the Court's ruling and shall contain only the citation to the case relied upon . . . .").

31. Although Plaintiffs' motion is procedurally improper under the Business Court Rules, the Court became, or would have become, aware of the cases cited in the motion through its own independent research. The Court therefore DENIES Plaintiffs' Motion for Consideration of Additional Authorities as MOOT.

## V. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

32. In response to Defendants' initial motion to dismiss, the Court allowed discovery on the issue of market definition. Based on that discovery, Plaintiffs now contend that there are four separate product markets for their antitrust claims, each of which is a legally cognizable relevant market. Those markets include a broad market that consists of all chiropractic services in North Carolina and three narrow submarkets. Defendants contend that only the broadest of the four markets is legally cognizable, but that claims based on that market fail because Defendants do not participate in that market as a buyer or seller of chiropractic services.

33. Based on the market discovery, Defendants further contend that summary judgment is appropriate because the uncontested record evidence necessitates a conclusion that, as a matter of law, Defendants do not have market

power in any of the proposed relevant markets. If the Court rejects their position, Defendants, through their Motion to Dismiss, renew their argument that Plaintiffs have not adequately alleged market power in the first instance.

34. The Court will first address the issue of market definition in the context of Defendants' Motion for Partial Summary Judgment.

A. **Legal Standard**

35. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2015). "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002). The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view all the presented evidence in the light most favorable to the nonmoving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

36. Although Defendants' Motion for Partial Summary Judgment is governed by state law, when ruling on the antitrust claims, the Court may consider federal case law as persuasive authority. *See Rose v. Vulcan Materials Co.*, 282 N.C.

643, 656–57, 194 S.E.2d 521, 530–31 (1973) (consulting federal decisions to inform the court's restraint-of-trade analysis); *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16 CVS 16404, 2017 NCBC LEXIS 33, at *44 (N.C. Super. Ct. Apr. 11, 2017), *petition for cert. filed*, No. 156P17 (N.C. May 19, 2017); *Window World of Baton Rouge, LLC v. Window World, Inc.*, Nos. 15 CVS 1, 15 CVS 2, 2016 NCBC LEXIS 82, at *14–15 (N.C. Super. Ct. Oct. 25, 2016).

**B.      Plaintiffs' Antitrust Claims and the Proposed Relevant Markets**

37.      Plaintiffs' central premise is that, to participate in the HNS network, Plaintiffs and class members must agree to restrict their average per-patient cost of medically necessary chiropractic services, which necessarily leads to a reduced output of those services.  They claim that HNS, for the benefit of the Insurers, has utilized that benchmark threshold to reduce the overall output of medically necessary chiropractic services solely on the basis of cost, and that the mere fact of HNS and the Insurers' success in achieving this output restriction implies the requisite market power necessary to support the antitrust claims.

38.      Plaintiffs attack the HNS network from many avenues.  The Second Amended Complaint invokes several different antitrust theories, grouped into a single, broadly alleged cause of action labeled "Price Fixing, Monopsony, and Monopoly."  (Second Am. Compl. ¶¶ 153–58.)  The Court has been required to segregate these various theories to resolve the summary-judgment motion.

39.      Plaintiffs assert antitrust claims under sections 75-1, 75-2, and 75-2.1 of the North Carolina General Statutes.  Those sections are analogues to sections 1

and 2 of the federal Sherman Act. *See* 15 U.S.C. §§ 1, 2 (2012). N.C. Gen. Stat. § 75-1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint or trade or commerce in the State of North Carolina." N.C. Gen. Stat. § 75-1. N.C. Gen. Stat. § 75-2 prohibits "[a]ny . . . restraint of trade or commerce" that violates common-law principles. *Id.* § 75-2. N.C. Gen. Stat. § 75-2.1 makes it "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce" in this State. *Id.* § 75-2.1. Section 75-2.1 also extends to monopsony claims. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315 (10th Cir. 2017) ("The same general framework for assessing market power applies to monopsony and monopoly situations alike.").

40. Any claim under these statutes requires a predicate relevant market. *See United States v. E.I. du Pont De Nemours & Co.*, 353 U.S. 586, 593 (1957). "Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning." *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). A relevant market has two components: a geographic market and a product market. *See, e.g.*, *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). The plaintiff has "the burden of proof on the issue of the relevant product and geographic markets." *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983).

41. The relevant geographic market is the area where suppliers "effectively compete and to which their customers could practicably turn for alternative sources

of such products" or services. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 170 (4th Cir. 1993).  In the case of "monopsony, or buyer-side market power, the relevant geographic market is the area to which sellers would turn to sell the relevant product [or service] if buyers attempted to exercise market power by lowering the price for the product [or service]."  1 John J. Miles, *Health Care & Antitrust Law: Principles and Practice* § 2:5 (2017).  The relevant geographic market is "[d]etermined within the specific context of each case" and "must 'correspond to the commercial realities of the industry' being considered and 'be economically significant.'"  *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962)).

42.    Here, the parties approach defining the geographic scope of the market through different logic, but they ultimately agree that the relevant geographic market is the State of North Carolina.  (*See* Second Am. Compl. ¶ 136; McCormick Report ¶ 63; Argue Aff. Ex. A ("Argue Report"), at 23 n.95.)  In contrast, the parties strongly disagree as to how to define the relevant product market.

43.    A relevant product market must focus on the range of products or services that actually compete in the disputed market, and turns on the concepts of reasonable interchangeability and cross-elasticity.  *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 593 (1966).  A relevant product market must take into account any reasonably interchangeable substitutes for a particular product or service.  *See United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 395 (1956); *see also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009)

("A court's determination of the limits of a relevant product market requires inquiry into the choices available to consumers."). The same principles used to define a relevant market for products are used to define a relevant market for services. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712 n.11 (7th Cir. 1979). The Court uses the term "product market" to refer to services provided by either HNS or its network members.

44. The Second Amended Complaint alleges that HNS possesses both selling-side (monopoly) market power, through which it extracts supracompetitive fees for its network administration, and buying-side (monopsony) market power, through which it restricts the output of medically necessary chiropractic services.

45. Monopsony is defined as a "market situation in which there is a single buyer or a group of buyers making joint decisions." *United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990) (quoting Richard G. Lipsey et al., *Economics* 976 (7th ed. 1984)). Often described as the "mirror image" of monopoly power, monopsony power is market power on the buy-side of the market. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321 (2007) (quoting John B. Kirkwood, *Buyer Power and Exclusionary Conduct: Should* Brooke Group *Set the Standards for Buyer-induced Price Discrimination and Predatory Bidding?*, 72 Antitrust L.J. 625, 653 (2005)). From an economic standpoint, monopoly and monopsony are "symmetrical distortions of competition." *Id.* at 322 (quoting *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984)).

**C.    The Four Relevant Product Markets Alleged in the Second Amended Complaint**

46.    Plaintiffs allege that their antitrust claims can proceed based on any of four relevant product markets for chiropractic services in North Carolina.  Stated from the narrowest to the broadest, they are (1) the HNS Market, (2) the Comprehensive Health Market, (3) the Insurance Health Market, and (4) the North Carolina Market.  (Second Am. Compl. ¶ 33(a)–(d).)

47.    Plaintiffs contend that a narrow product market limited to services provided by HNS members is the proper market for analyzing the antitrust claims in this action because a chiropractor's access to in-network services is economically vital, and through its contracts, HNS essentially controls that access.  Defendants contend that, having now been given the benefit of discovery, Plaintiffs have failed to produce evidence necessary to support any of their allegations.

48.    The HNS Market is defined as "the market in which in-network managed care chiropractic services (a wholesale market of purchases by aggregated buyers) are provided to the Insurers and their North Carolina patients through HNS."  (Second Am. Compl. ¶ 33(a).)  Plaintiffs assert that in this market, HNS acts as the single agent for the Insurers' aggregated purchases of in-network chiropractic services.

49.    The Comprehensive Health Market is defined as "the market for in-network chiropractic services provided to individual and group comprehensive healthcare insurers and their patients in North Carolina."   (Second Am. Compl.

¶ 33(b).) This market includes the HNS network but further includes services provided by other chiropractic networks on an in-network basis.

50. The Insurance Health Market is defined as "the market for insurance reimbursed chiropractic services in North Carolina." (Second Am. Compl. ¶ 33(c).) This market includes all insured chiropractic services, without regard to whether the chiropractor is in or out of a particular insurer's network, but excludes alternative purchasers such as self-paying patients or patients covered by government-funded insurance.

51. The North Carolina Market is defined as "the market for chiropractic services provided in North Carolina." (Second Am. Compl. ¶ 33(d).) This market includes all chiropractic services, including patients with private insurance, self-paying patients, and patients covered by government programs.

52. Plaintiffs broadly assert that "[e]ach of these market segments are markets in which HNS and the Insurers have market power and in which insurance companies have aggregated patient–buyers to obtain in-network managed care chiropractic services pursuant to which patients are incentivized to use Providers who are in-network." (Second Am. Compl. ¶ 33.) Specifically, Plaintiffs claim that HNS controls 100% of the HNS Market and a "materially significant percentage" of the Comprehensive Health Market, the Insurance Health Market, and the North Carolina Market. (Second Am. Compl. ¶ 46.)

53. For the reasons discussed below, the Court concludes that the proper market to assess the antitrust claims in this litigation must be the North Carolina

Market, which includes all insured and uninsured chiropractic services. The Court will later discuss Defendants' contention that HNS does not participate in this market. It requests supplemental briefing on the issue of market power as the issue has been framed by this Order & Opinion.

## D.     The Parties' Opposing Expert Reports

54.     Plaintiffs' expert, Dr. Robert E. McCormick, and Defendants' expert, Dr. David A. Argue, offer conflicting views on the proper relevant market for the antitrust claims in this litigation. Each appears well qualified to express an opinion on market definition, and the competency of neither expert has been challenged.

55.     Dr. McCormick advocates Plaintiffs' proposed HNS Market, which he defines as "the wholesale market for N.C. licensed Chiropractic services purchased by HNS on behalf of [Blue Cross] and other health insurers." (McCormick Report ¶ 38; *see also* McCormick Dep. 133:13–25.) When defining the relevant product market, Dr. McCormick says that it is not appropriate to include patients that receive chiropractic services on an out-of-network basis, from other insurers, or on a self-pay or government-funded basis. Dr. McCormick describes HNS as a "market maker" for the in-network services that controls access to the dominant insurers, (McCormick Dep. 110:2,) with the effect that HNS has the power to control access and restrict output by eliminating "high demanders" and "expensive patients" in the production of chiropractic services, (McCormick Report ¶ 64.) Dr. McCormick considered Plaintiffs' broader alternative market definitions but did not offer support for those proposed markets.

56.    Dr. Argue accepts Plaintiffs' fourth and broadest proposed market, the North Carolina Market, as a cognizable market but contends that HNS does not participate in that market. (Argue Report ¶ 1(c)–(e).) Dr. Argue insists that the relevant market must include "the purchase of chiropractic services in North Carolina by commercial health plans and self-paying patients as well as by other purchasers of chiropractic services like Medicare, Medicaid, workers' compensation programs, auto liability, and others," stressing evidence that chiropractors, including Plaintiffs, regularly provide—and sometimes prefer—providing services on a non-insured basis. (Argue Report ¶ 1(c).) Within the broad North Carolina Market, Dr. Argue refers to HNS as an "intermediary" that does not itself purchase chiropractic services. (Argue Report ¶ 1(d).)

57.    Though the parties' experts have opposing views, the definition of the relevant market is essentially an issue for the Court. For that reason, the experts' differing opinions do not preclude summary adjudication of the product market definition.

E.    **Defendants' Challenges to the Proposed Market Definitions**

(1)    **The HNS Market**

58.    The Court separately addresses Plaintiffs' proposed markets from narrowest to broadest, beginning with the HNS Market. Defendants' opposition to Plaintiffs' three submarkets overlaps as to their argument that any market must include the delivery of all chiropractic services, regardless of the payment method used to purchase those services.

59. Defendants assert that any market defined more narrowly than the North Carolina Market is not legally cognizable for the following reasons. First, it is improper to define a market composed of just a single purchaser. Second, there is no basis for arbitrarily restricting the market to purchases of chiropractic services at the aggregate wholesale distribution level. Third, there is no legitimate legal basis for limiting the market to the delivery of in-network chiropractic services. Fourth, for related reasons, any proper market must include all alternative consumers of chiropractic services, including those who pay on a cash basis or through government-funded insurance.

60. Defendants rely heavily on the discovery record, which demonstrates that North Carolina chiropractors, including Plaintiffs, regularly supply services outside of the narrowly defined HNS Market.

### a. The single-purchaser limitation

61. Defendants contend that under well-established antitrust principles, a single purchaser of a product or service should not be considered a relevant market. *See, e.g.*, *Jayco Sys., Inc. v. Savin Bus. Mach. Corp.*, 777 F.2d 306, 320 (5th Cir. 1985); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 128 F. Supp. 2d 988, 998–99 (N.D. Tex. 2001). They argue that, to the contrary, any buying-side market must account for all reasonably interchangeable purchasers of the product or service at issue. (*See* Argue Report ¶ 64 ("Of course, in such a mis-defined market, HNS would account for 100% of the purchases, but that 'market' has no meaning for an antitrust analysis.");) *see also Apani*, 128 F. Supp. 2d at 999.

62. Plaintiffs counter that there is more than one purchaser in the HNS Market, and even if that were not the case, a single purchaser can constitute a cognizable relevant market for antitrust purposes. Plaintiffs contend that the Insurers that contract with HNS are separate purchasers in the HNS Market, even though HNS aggregates those purchasers to manipulate the conduct of its network members. Accordingly, they argue that Defendants unfairly label the HNS Market as a single-purchaser market. (Pls.' Br. Opp'n to Defs.' Mot. Partial Summ. J. 19; *see also* McCormick Report ¶ 38 ("The relevant buyer is HNS on behalf of the Blue Cross . . . insurance networks [and the other Insurers' networks] . . . .").)

63. As to the underlying antitrust principle on which Defendants rely, Plaintiffs argue that there is no authority that precludes a single-purchaser relevant market in all instances as a matter of law. They refer to the United States Supreme Court's rejection of such a bright-line rule in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). In that case, the defendant, Kodak, manufactured and sold photocopiers, as well as service and replacement parts for its equipment. *Id.* at 455. The plaintiffs were independent service organizations that repaired and serviced Kodak equipment at prices substantially lower than Kodak's prices. *Id.* at 457. Kodak implemented a policy that limited the sale of replacement parts to buyers of Kodak equipment who also either used Kodak service or did their own repairs. *Id.* at 458. This policy reduced the plaintiffs' access to the replacement parts needed to service Kodak machines. *Id.*

64.     The Supreme Court upheld the appellate court's holding that there was a triable issue of fact as to the availability of interchangeable substitutes for Kodak replacement parts and service in the market. The Court noted that, "in some instances[,] one brand of a product can constitute a separate market." *Id.* at 482 (first citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101–02 (1984); then citing *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249–52 (1959); then citing *Int'l Bus. Machs. Corp. v. United States*, 298 U.S. 131 (1936)). The Court concluded that the "proper market definition" could "be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* (citing *Grinnell Corp.*, 384 U.S. at 572).

65.     The Court need not resolve the contested issue whether the HNS Market is properly defined as a single-purchaser market. Here, discovery has demonstrated the "commercial realities" that there are interchangeable methods of delivering chiropractic services that make the narrow HNS Market an improper market for the analysis and resolution of Plaintiffs' antitrust claims, whether that market includes a single purchaser or multiple purchasers.

66.     *Kodak* must be read in context with its unique facts, which involved a derivative aftermarket in which purchasers for parts and service were "locked in" to Kodak photocopiers or equipment. *Id.* at 476; *see also Window World of Baton Rouge*, 2016 NCBC LEXIS 82, at *18–20 (discussing *Kodak*). In contrast, in this case, the record establishes that both chiropractors and patients have access to chiropractic services other than through HNS-administered networks. Moreover, HNS members

are not required to render services only on an insured in-network basis, and they are free to accept patients with other means of payment. The record clearly reveals that both Plaintiffs and HNS members have pursued access to these alternative means of providing chiropractic services.

67. The Court is also mindful that "'[c]ourts have been extremely reluctant to embrace' *Kodak*'s single-brand market theory, 'much less to extend it to other types of goods.'" *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009) (quoting *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1094–95 (C.D. Cal. 2007)); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) (rejecting as impermissibly narrow a single-brand market "consisting solely of U.S. Healthcare members with prescription drug benefits"); *City of N.Y. v. Versus Grp. Health Inc.*, No. 06 Civ. 13122 (RJS), 2010 U.S. Dist. LEXIS 60196, at *10, *14 (S.D.N.Y. May 11, 2010) (holding that a proposed relevant market defined as the "low-cost municipal health benefits market"—a market limited to two health-plan providers as a result of the plaintiff's gatekeeping role in selecting health-plan providers for its benefits program—was untenable because the plaintiff "defined the relevant market solely with regard to its own preferences"), *aff'd*, 649 F.3d 151 (2d Cir. 2011); *Streamcast Networks*, 547 F. Supp. 2d at 1094 (noting that "the few cases in which courts have acknowledged the possibility of limiting the relevant market to a single brand have involved markets for replacement parts for specific brands of durable goods where consumers are 'locked-in' to maintaining them").

68.     The Court concludes that the uncontroverted record evidence is ample to demonstrate the impropriety of limiting the relevant market to the narrow confines of the HNS Market, regardless of whether the HNS Market is a single-purchaser market.

### b.     The wholesale limitation

69.     Defendants' argument regarding Dr. McCormick's wholesale-market structure recasts their arguments opposing a single-purchaser market and again stresses the commercial reality that chiropractors have wide access to alternative consumers of chiropractic services.  (Defs.' Br. Supp. Mot. Partial Summ. J. 14.)  Dr. Argue emphasizes the role of self-paying patients in the marketplace.  (Argue Report ¶ 51 ("Self-payment by patients for chiropractic services is very substantial . . . .").)  The Court is mindful that "[a] relevant market definition must focus on the product rather than the distribution level." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010).

70.     Discovery in this case shows that there is a significant marketplace for chiropractic services purchased through several different payment methods.  The developed evidence includes the following testimony:

- Most of Dr. Bost's patients are uninsured, and he provides chiropractic services to other patients on an out-of-network basis.  (Bost Dep. 35:18; 76:6–77:22.)  Only 10% of Dr. Bost's patients are commercially insured, and self-paying patients account for 60% of his revenues.  (Bost Dep. 76:16–77:22.)

- "[T]he chiropractic practices of Dr. John Smith, Dr. Abernathy, and Dr. Roccos receive an average of 62.2% of their practice revenue from cash payments by patients." (Argue Report ¶ 52.)

- Approximately 20% of Dr. Lynn's patients pay for his services in cash, and he "frequently" shifts his insured patients to maintenance care, which must be paid out of pocket by the patient because it is not typically covered by insurance. (Lynn Dep. 55:7–20.)

- "Dr. Patrick uses a lower rate schedule for self-pay patients which further increases the incentive" for patients to not turn to insurance benefits. (Argue Report ¶ 53.) Dr. Patrick estimates that approximately 30% to 35% of her and Dr. Lynn's revenues come from cash payments. (Patrick Dep. 54:18–19.)

- The largest segment of Dr. Steven Binder's patient population pays for their services in cash. (S. Binder Dep. 52:1–5.)

- Dr. Sykes treats Blue Cross and Cigna patients on an out-of-network basis and testified that 17% of her patients "had no insurance that could be billed in any way, shape or form." (Sykes Dep. 46:25–47:2.)

71. The Court concludes that this evidence adequately demonstrates that the relevant market cannot be confined to an aggregated market limited to those chiropractic services that Plaintiffs' expert says are purchased by HNS on a wholesale basis.

### c. The "in-network" limitation

72. Notwithstanding the record evidence summarized above, Plaintiffs urge that it is proper to limit the relevant market to in-network insured services because "there is a significant advantage for a chiropractor to be an in-network Provider for an Insurer." (Second Am. Compl. ¶ 35.) Plaintiffs' preferences cannot serve as a meaningful limitation for a relevant market that otherwise must account for reasonable alternative purchasers. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (noting that the plaintiff's preference to practice at a particular hospital did "not justify excluding other hospitals and other doctors from the relevant market definition"); *HPC Biologicals, Inc. v. UnitedHealthcare of La., Inc.*, 194 So. 3d 784, 795 n.2 (La. Ct. App. 2016) ("[P]roduct market definition turns on the existence of close substitutes, not the ability to switch effortlessly to such substitutes."). Such a "narrow market definition violates a fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition." *Oksanen*, 945 F.2d at 709 (citing *Grinnell Corp.*, 384 U.S. at 572–73).

73. Defendants correctly note that "the question is not whether chiropractic *patients* view Medicaid, Medicare, private insurance, and self-payment as reasonably interchangeable," but "whether those potential purchase[r]s are buyers to whom chiropractors can sell their services." (Defs.' Br. Supp. Mot. Partial Summ. J. 20.)

### d. The private-insurance limitation

74. Defendants argue that the "most problematic aspect" of the narrow HNS Market is that it is limited to a marketplace involving only those services purchased

through private insurance benefits, even though the evidence is clear that chiropractic services are regularly provided through a much wider channel. (Defs.' Br. Supp. Mot. Partial Summ. J. 17.) In particular, Defendants urge that such a narrow market arbitrarily excludes cash purchasers and government purchasers like Medicaid and Medicare, which must be included in any reasonable antitrust analysis.

75. Defendants urge that the holding of the United States Court of Appeals for the Eighth Circuit in *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, is apposite and dispositive. There, a group of cardiologists alleged that Blue Cross and Blue Shield of Arkansas's termination of network-provider agreements with the plaintiffs violated the Sherman Act as an unlawful restraint of trade. *Id.* at 595. The plaintiffs in that case argued that the product market should be limited to patients who use private insurance, because private insurance and government insurance were not reasonably interchangeable. *Id.* at 597. The Eighth Circuit rejected the plaintiffs' proposed relevant-market definition because "the complaint erroneously defined the product market by how consumers pay for cardiology services." *Id.* at 596. The court explained that while, from the patient's perspective, private insurance and government insurance might not be reasonably interchangeable, the focus must be on "the options available to shut-out cardiologists," not "the options available to patients." *Id.* at 597.

76. The court in *Little Rock* concluded that, "as a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to

the seller." *Id.* at 598. The court noted that a proposed "market limited by how consumers pay for cardiology procedures. . . . lacks support in both logic and law." *Id.* at 597; *see also Tri State Advanced Surgery Ctr., LLC v. Health Choice, LLC*, No. 3:14cv143-JM, 2015 U.S. Dist. LEXIS 50164, at *15 (E.D. Ark. Apr. 16, 2015) (rejecting a proposed market definition that was narrowly "limited to the market for surgical services or procedures obtained by patients covered by Cigna health insurance which do not require hospitalization"); *id.* at *16 (describing the proposed market definition in *Tri State* as "narrower than the product market that was found lacking in" *Little Rock*).

77. While Plaintiffs seek to distinguish *Little Rock* on its facts, their primary argument is that the *Little Rock* court wrongly "relied on logic, not facts," and failed to allow "discovery into the underlying realities." (Pls.' Br. Opp'n to Defs.' Mot. Partial Summ. J. 16.) The Court finds the Eighth Circuit's analysis persuasive, particularly when applied to this case, where the Court has a developed record based on discovery.

78. The Court acknowledges that in cases based on different facts, courts have concluded that insured services were not reasonably interchangeable with services funded by alternative methods. *See, e.g., In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 U.S. Dist. LEXIS 99705, at *24–25 (N.D. Ala. June 28, 2017) (holding that the plaintiffs' product market, which excluded government and private payors, was plausible because it reflected the reality that "the substitution between commercial buyers and other payors is low, as reflected in

measures such as a low cross elasticity of demand"); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13-cv-01054-SLD-JEH, 2016 U.S. Dist. LEXIS 136478, at *28 (C.D. Ill. Sept. 30, 2016) (excluding government insurers from the product market because "the record suggests that the medical bills charged to commercial payers and public payers are markedly different"), *aff'd*, 859 F.3d 408 (7th Cir. 2017); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 161 (D.R.I. 2014) (finding that the alleged product market, which ignored the presence of Medicare and Medicaid, was plausible because private-insurance payors and government payors are not interchangeable).

79.     But the Court concludes that the particular facts demonstrated through full market discovery in this case regarding the delivery of chiropractic services in North Carolina demonstrates a clear interchangeability between insured and non-insured services, and that it would thus be improper to limit the relevant product market to only insured services.

80.     In sum, based on the factors discussed above, the Court concludes, as a matter of law, that the HNS Market is not a legally cognizable relevant market on which Plaintiffs can pursue their antitrust claims.

**(2)     The Comprehensive Health Market**

81.     Plaintiffs' second proposed market is the Comprehensive Health Market, defined as "the market for in-network chiropractic services provided to individual and group comprehensive healthcare insurers and their patients in North Carolina." (Second Am. Compl. ¶ 33(b).) This market broadens the proposed HNS

Market to include insurers other than those that contract with HNS but also excludes services funded through alternative payment methods such as cash or government-funded programs.

82.     For the same reasons discussed above, the Court concludes, as a matter of law, that the Comprehensive Health Market suffers from the same deficiencies as the narrow HNS Market.  While not dispositive, the Court notes that Dr. McCormick did not offer support for this proposed market.  (*See* McCormick Dep. 112:7–14; McCormick Dep. Ex. 74, ¶ 31;) *see also Versus Grp. Health*, 2010 U.S. Dist. LEXIS 60196, at \*14 ("A further, independent flaw with the City's proposed market definition is that it is not supported by the City's own expert report.").

**(3)     The Insurance Health Market**

83.     Plaintiffs' third proposed market, the Insurance Health Market, is defined as "the market for insurance reimbursed chiropractic services in North Carolina."  (Second Am. Compl. ¶ 33(c).)  This market is broader than the Comprehensive Health Market only in that it includes chiropractic services paid by insurance on both an in-network and out-of-network basis and is not limited to insurers that contract with HNS.  But like the narrower HNS Market and Comprehensive Health Market, the Insurance Health Market excludes cash and government-funded payments.

84.     Dr. McCormick also elected not to support this market definition.  (*See* McCormick Dep. 122:18–123:7.)

85.     For the same reasons discussed above, the Court concludes, as a matter of law, that the Insurance Health Market is not a cognizable relevant product market to support Plaintiffs' antitrust claims.

**(4)     The North Carolina Market**

86.     Plaintiffs define the North Carolina Market as "the market for chiropractic services provided in North Carolina." (Second Am. Compl. ¶ 33(d).) Defendants accept this market as a cognizable product market. (Argue Report ¶ 1(c).)

87.     The Court likewise accepts the proposed North Carolina Market as a proper market definition.

88.     Defendants contend that they are nevertheless entitled to summary judgment because they do not participate in the North Carolina Market as a buyer or provider of chiropractic services; rather, they contend that the purchasers are the health plans that contract with HNS. (Argue Report ¶ 57.) Defendants contend that Plaintiffs concede that "the ultimate purchasers are [Blue Cross], Cigna, MedCost and the other insurers that have agreements with HNS and that HNS is acting as an agent or intermediary." (Pls.' Br. Opp'n to Defs.' Mot. Partial Summ. J. 19.)

89.     Plaintiffs assert two primary contentions as to why HNS participates in the North Carolina Market. First, they assert that HNS acts as the Insurers' agent. This overlaps with Plaintiffs' antitrust conspiracy theories. Second, Plaintiffs argue that HNS's retaining a percentage of insurance payments made for chiropractic services renders a claim of nonparticipation disingenuous.

90. The United States Court of Appeals for the Fourth Circuit has held that "[o]ne who does not compete in a product market or conspire with a competitor cannot be held liable as a monopolist in that market." *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir. 1987). Defendants rely on three cases that expand on the Fourth Circuit's general pronouncement: *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998), *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065 (11th Cir. 2004), and *Abraham & Veneklasen Joint Venture v. American Quarter Horse Ass'n*, 776 F.3d 321 (5th Cir. 2015). Again, cases must be analyzed in light of their specific facts.

91. In *Aquatherm*, a manufacturer of solar-powered heating systems for swimming pools brought antitrust claims against an electric-power company that provided electricity for approximately two-thirds of the State of Florida, alleging that the power company conspired with unnamed retailers of electric heat pumps to monopolize the market for swimming-pool heaters by running false advertisements pertaining to cost-efficiency of heat pumps over solar heaters. 145 F.3d at 1260. The defendant did not sell pool heaters of any kind.

92. The United States Court of Appeals for the Eleventh Circuit first noted that the plaintiff's claim that the defendant "entered an agreement with manufacturers and sellers of electric pool heat pumps in order to increase its sales of electric power" was not, without more, "evidence of an intent to monopolize," because "'increasing sales' and 'increasing market share' are normal business goals, not

forbidden by [antitrust law]." *Id.* at 1261 (quoting *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 612 n.1 (1977)).

93.     The Eleventh Circuit affirmed the lower court's ruling dismissing the plaintiff's monopoly-leveraging claim, noting that there was "no showing [that the defendant] in any way sought a competitive advantage in the pool-heater market, because [the defendant] did not *compete* in the pool-heater market." *Id.* at 1262. The court also dismissed the plaintiff's conspiracy-to-monopolize claim, noting the lack of evidence "of concerted action deliberately entered into with the specific intent of achieving a monopoly in the pool-heater market." *Id.* The court noted in a footnote that "no authority exists holding a defendant can conspire to monopolize a market in which it does not compete." *Id.* at 1262 n.4.

94.     In *Spanish Broadcasting*, the owner of Spanish-language radio stations sued two allegedly dominant firms in the market for Spanish-language radio broadcasts, claiming that the firms unlawfully restrained trade by attempting to limit the plaintiff's ability to compete in that market. 376 F.3d at 1069. Citing *Aquatherm*, the Eleventh Circuit held that one of the two firms—the parent company of the other firm—did not participate in the Spanish-language radio market and thus could not attempt to monopolize that market. *Id.* at 1075.

95.     The court carefully noted, however, that a non-market-participant might still be liable for a conspiracy-to-monopolize claim—a claim that was not raised by the complaint in that case. *Id.* The court further distinguished the statement in *Aquatherm* that "no authority exists holding a defendant can conspire to monopolize

a market in which it does not compete," *Aquatherm*, 145 F.3d at 1262 n.4, noting that the plaintiffs in *Aquatherm* failed to name or identify the alleged co-conspirators who participated in the relevant market. *Spanish Broad. Sys.*, 376 F.3d at 1078 n.10. In contrast, the court explained, the plaintiff in *Spanish Broadcasting* alleged a conspiracy between "a clear market participant" and a non-market-participant, and "[n]othing in our case law suggests that a conspiracy must be limited solely to market participants so long as the conspiracy also involves a market participant and the non-participant has an incentive to join the conspiracy." *Id.* (citing *Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001) ("[W]e conclude that there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive.")).

96. In *Abraham*, a business that was formed to invest in shares of American Quarter Horses created through cloning sued a nonprofit organization that operated the Quarter Horse breed registry, asserting that the organization violated antitrust law when it conspired with an outside committee to adopt a rule preventing cloned horses from being registered as American Quarter Horses. 776 F.3d at 326. The plaintiffs alleged that the conspiracy effectively excluded their horses from the market for elite Quarter Horses. *Id.*

97. After discussing at length the question of which entities are capable of conspiring under the Sherman Act, the Fifth Circuit dismissed the plaintiffs'

antitrust claims because nothing in the record showed that the defendant organization actually competed in the elite Quarter Horse Market. *Id.* at 327–30, 335. The court rejected the plaintiffs' argument that competition in the monopolized market is not a requirement for a monopolization claim, noting that "[t]he ability to extract above-market profits from raised prices, the possession of large market share, and the ability to exclude one's competitors are all factors that could only apply to a party who participates in the relevant market that has been monopolized." *Id.* at 335.

98. While these cases lend support to the specific argument that HNS is not itself a direct participant in the North Carolina Market as a buyer or seller of chiropractic services, the analysis of HNS's potential antitrust liability does not end there. The cases also demonstrate that a market participant and a non-market-participant can engage in a conspiracy that violates antitrust law. *See also Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996) ("[T]o be liable for conspiracy to monopolize, it is not necessary that the [defendants] compete directly in the [relevant] market . . . . A defendant may be liable for conspiracy to monopolize where it agrees with another firm to assist that firm in its attempt to monopolize the relevant market."), *vacated on other grounds*, 525 U.S. 128 (1998); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1130 (C.D. Cal. 2009) (citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982)) (noting that, "[w]hile much of the discussion in *Hydrolevel* is devoted to agency and immunity principles, it is clear that the Supreme Court recognized a species of Section 1

conspiracies involving an industry participant and an ostensibly neutral party"). Those cases also make clear that allegations must ultimately be supported by evidence.

99. Defendants contend that the record evidence affirmatively disproves any conspiracy between HNS and the Insurers. For example, they point to the Intermediary Services Agreement between Blue Cross and HNS, which describes HNS as an "intermediary" that performs certain "administrative" and "network support services" and states that Blue Cross retains "financial responsibility" to its enrollees. (P. Binder Aff. at HNS00004346, Aug. 28, 2015.) HNS's contract with Cigna provides that HNS has "established a panel of Represented Providers by engaging in negotiations of contracts with such providers." (P. Binder Aff. at HNS00004399, Aug. 28, 2015.) MedCost's Participating Physician Organization Agreement requires HNS to contract with "Participating Providers" to ensure that the providers abide by the terms of MedCost's contract when offering medical services to enrollees. (P. Binder Aff. at HNS00004455, Aug. 28, 2015.) According to Dr. Argue, these "health plan agreements outline[ ] HNS's role to form a network to be available for the plans' enrollees but not actually to purchase the services." (Argue Report ¶ 58.)

100. There is authority for the argument that mere contractual privity is inadequate to support a claim of antitrust conspiracy between a participant and a non-participant in a relevant market. *See, e.g.*, *Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 392–93 (S.D.N.Y. 2007)

(concluding that an SEC clearing agency's alleged influence over the transfer-agent industry, which derived from the agency's purported monopoly position in the closely related securities-depository industry, did not make the agency a participant in the transfer-agent industry); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 616, 620 (D. Md. 2001) (holding that a defendant that "facilitate[d] the sale of newspaper advertising for community newspapers in exchange for a commission" did not participate in the market for "weekly community newspapers" and thus could not be liable for monopolization or attempted-monopolization claims but could be liable for a conspiracy-to-monopolize claim).

101.    But considering the record as a whole, and having concluded that the North Carolina Market is a cognizable product market, the Court further concludes that there are disputed issues of fact as to whether Defendants participate in that market.  For example, there is a mixed question of fact and law as to whether arranging the delivery of chiropractic services should be considered "buying" or "selling" those services.  Further, assuming that Defendants are not de facto buyers or sellers in the North Carolina Market, there is a fact question as to whether they are sufficiently tied to the Insurers as "participants" or co-conspirators in that market.  The materiality of these fact questions depends on whether Plaintiffs have adequately pleaded that HNS, the Insurers, or HNS and Insurers combined, have market power in the North Carolina Market.  This will be the subject of further briefing guided by the discussion below.

## VI.    DEFENDANTS' MOTION TO DISMISS

102.    Defendants' Motion to Dismiss invokes both Rule 12(b)(1) and Rule 12(b)(6). The Court first addresses whether, pursuant to Rule 12(b)(1), it has subject-matter jurisdiction to consider Plaintiffs' claims for violations of North Carolina's Insurance Code, and then analyzes Defendants' challenge to the remaining claims under Rule 12(b)(6).

### A.    <u>Legal Standard</u>

103.    On a motion to dismiss under Rule 12(b)(1), the Court "may consider and weigh matters outside the pleadings." *Dep't of Transp. v. Blue*, 147 N.C. App. 596, 603, 556 S.E.2d 609, 617 (2001). If the Court "confines its evaluation to the pleadings," however, it "must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff." *Id.*

104.    On a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court considers "whether the pleadings, when taken as true, are legally sufficient to satisfy the elements of at least some legally cognizable claim." *Arroyo v. Scottie's Prof'l Window Cleaning, Inc.*, 120 N.C. App. 154, 158, 461 S.E.2d 13, 16 (1995) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008) (quoting *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620

S.E.2d 873, 880 (2005)), and it may ignore the plaintiff's legal conclusions, *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

105. The Court will grant a motion to dismiss under Rule 12(b)(6) when any of three things is true: (1) no law supports the plaintiff's claim, (2) the complaint does not plead sufficient facts to state a legally sound claim, or (3) the complaint discloses a fact that defeats the plaintiff's claim. *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

106. Defendants' Motion to Dismiss must be decided under state law, but the Court may consider federal case law as persuasive authority for the antitrust claims. *See Rose*, 282 N.C. at 656–57, 194 S.E.2d at 530–31; *DiCesare*, 2017 NCBC LEXIS 33, at *44; *Window World of Baton Rouge, LLC*, 2016 NCBC LEXIS 82, at *14–15. However, when considering federal case law, the Court does not apply the "plausibility" standard used in connection with motions to dismiss under federal Rule 12(b)(6). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**B.    Analysis**

**(1)    Plaintiffs lack standing to bring claims predicated on alleged chapter 58 violations.**

107. Plaintiffs' declaratory-judgment claim seeks ten separate declarations. Three of those requests ask the Court to declare that HNS operates illegally either as an unlicensed medical-service corporation, defined in N.C. Gen. Stat. § 58-65-1 and subject to licensure under N.C. Gen. Stat. § 58-65-50, or as an unlicensed utilization-review organization, defined in N.C. Gen. Stat. § 58-50-61(a)(18). (Second Am. Compl. ¶ 151(a)–(c).)

108. Defendants contend that Plaintiffs lack standing to seek these declarations because the regulation of HNS's challenged conduct is within the exclusive domain of the North Carolina Insurance Commissioner, and the provisions of chapter 58 on which Plaintiffs rely provide no private cause of action.

109. North Carolina case law "holds that a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute." *Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 228 N.C. App. 510, 516, 747 S.E.2d 610, 615 (2013) (quoting *Vanasek v. Duke Power Co.*, 132 N.C. App. 335, 339 n.2, 511 S.E.2d 41, 44 n.2 (1999), *overruled on other grounds by Lovelace v. City of Shelby*, 351 N.C. 458, 526 S.E.2d 652 (2000)). A statute may "enunciate an explicit or implicit intent on the part of the General Assembly" to afford a private cause of action. *Lea v. Grier*, 156 N.C. App. 503, 509, 577 S.E.2d 411, 416 (2003); *see Williams v. Alexander Cty. Bd. of Educ.*, 128 N.C. App. 599, 603, 495 S.E.2d 406, 408 (1998).

110. Chapter 58 does not explicitly afford a private cause of action. The North Carolina Court of Appeals has held that alleged violations of other sections of chapter 58 do not give rise to a private cause of action and can be remedied only by action of the Insurance Commissioner. *E.g.*, *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 281, 715 S.E.2d 541, 552 (2011) (holding that there is no private action under North Carolina's anti-twisting statute, N.C. Gen. Stat. § 58-3-115); *Defeat the Beat, Inc. v. Underwriters at Lloyd's London*, 194 N.C. App. 108, 117–18, 669 S.E.2d 48, 54

(2008) (holding that there is no private right of action under North Carolina's surplus-lines statute, N.C. Gen. Stat. § 58-21-45(a)).

111. Two recent federal decisions reached the same conclusion. In *Kearney v. Blue Cross & Blue Shield of North Carolina*, the plaintiff sought a declaration that Blue Cross violated N.C. Gen. Stat. § 58-3-225, known as North Carolina's Prompt Pay Act. No. 1:16-cv-191, 2017 U.S. Dist. LEXIS 18428, at *2–3 (M.D.N.C. Feb. 9, 2017). The district court dismissed the claims, holding that section 58-3-225 does not authorize a private cause of action. *Id.* at *17. The court observed that section 58-3-225 "specifically provides detailed enforcement procedures for the Commissioner of Insurance, and no such provisions for claimants," which "strongly suggests that the North Carolina General Assembly did not intend to create a private right of action." *Id.* at *16 (citing *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979) (explaining that "where a statute expressly provides a particular remedy or remedies," courts must be cautious of "reading others into it")).

112. In *Exact Sciences Corp. v. Blue Cross & Blue Shield of North Carolina*, the plaintiffs sought a declaration that Blue Cross violated North Carolina's coverage mandate for colorectal-cancer screening under N.C. Gen. Stat. § 58-3-179. No. 1:16CV125, 2017 U.S. Dist. LEXIS 44679, at *10–11 (M.D.N.C. Mar. 27, 2017). The court dismissed the plaintiffs' claim, concluding that there is no implied right of action under section 58-3-179. *Id.* at *34.

113. In reaching its conclusion, the *Exact Sciences* court referred to section 58-2-40(5), which provides that the Insurance Commissioner shall "[r]eport in detail

to the Attorney General any violations of the laws relative to insurance companies . . . and may institute civil actions or criminal prosecutions either by the Attorney General or another attorney whom the Attorney General may select, for any violation of the provisions of Articles 1 through 64 of [chapter 58]." N.C. Gen. Stat. § 58-2-40(5); *see Exact Scis. Corp.*, 2017 U.S. Dist. LEXIS 44679, at *33. The court noted that the plaintiffs' argument that the coverage mandate creates a private right of action contradicts this quoted language. *Exact Scis. Corp.*, 2017 U.S. Dist. LEXIS 44679, at *33.

114. The sections of chapter 58 that pertain to licensure of medical-service corporations and utilization-review organizations contemplate remedial action by the Insurance Commissioner. For instance, section 58-50-61 explicitly states that a violation of that section subjects an insurer licensed or certified under chapter 58 to action by the Insurance Commissioner under section 58-2-70. N.C. Gen. Stat. § 58-50-61(o). Section 58-65-2 explicitly states that service corporations subject to licensure or certification under section 58-65-1 are subject to investigation and other action by the Insurance Commissioner. *Id.* § 58-65-2. The Court sees no legislative implication that sections 58-50-61, 58-65-1, and 58-65-50 allow for enforcement by a private party.

115. The Court has considered but rejects Plaintiffs' reliance on cases involving breach-of-contract claims brought by unlicensed professionals. *See, e.g.*, *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 270–71, 162 S.E.2d 507, 511 (1968) (applying the common-law doctrine of illegality to dismiss an unlicensed contractor's

breach-of-contract claim against a homeowner); *Gower v. Strout Realty, Inc.*, 56 N.C. App. 603, 605, 289 S.E.2d 880, 882 (1982) (noting that an unlicensed real-estate broker cannot enforce a contract for commission from a real-estate sale). Those cases did not seek to substitute a court's judgment for that of a regulatory agency to which the legislature has entrusted enforcement.

116. In its November 2013 order denying Plaintiffs' motion for preliminary injunction, the Court expressed its reservation as to whether Plaintiffs have standing to present their chapter 58 claims. *Sykes I*, 2013 NCBC LEXIS 50, at *23. In its December 5, 2013 order denying Defendants' motion to dismiss Plaintiffs' first amended complaint, the Court again deferred consideration of Plaintiffs' standing to bring a private cause of action under chapter 58 until after initial discovery allowed for a more developed record. *Sykes I*, 2013 NCBC LEXIS 52, at *13.

117. The Court now holds that Plaintiffs have no private cause of action under the chapter 58 provisions on which they rely. As a result, Plaintiffs lack standing to seek the requested declarations, which essentially ask for an advisory opinion as to whether the Insurance Commissioner should take action to enforce HNS's licensure as a medical-service corporation under section 58-65-1 or a utilization-review organization under section 58-50-61(a)(18). *See Danielson v. Veritext Corp. Servs., Inc.*, No. 16 CVS 1393, 2016 NCBC LEXIS 83, at *11 (N.C. Super. Ct. Oct. 28, 2016) (noting that the statutory rule at issue did not provide a private cause of action and declining "to render, under the guise of the Declaratory Judgment Act, what would in essence be an advisory opinion"). Accordingly,

Defendants' Motion to Dismiss Plaintiffs' declaratory-judgment claim is granted to the extent that the claim alleges chapter 58 violations.

**(2)** **Plaintiffs' section 75-1.1 claim is barred by the learned-profession exemption.**

118. Plaintiffs assert a claim under N.C. Gen. Stat. § 75-1.1 based on the same facts underlying their antitrust and chapter 58 claims. (Second Am. Compl. ¶ 162(a)–(m).) The Court concludes that the section 75-1.1 claim is barred by the learned-profession exemption as that exemption has been interpreted by North Carolina's appellate courts.

119. Plaintiffs clearly and directly challenge the manner in which professional chiropractic services are rendered in North Carolina. They are frank in expressing their hope to eliminate the HNS network altogether. Their claim presents the issue whether a claim that materially and directly affects the manner and method of delivering services by members of a learned profession can proceed under section 75-1.1. Appellate precedent compels the conclusion that Plaintiffs' section 75-1.1 claim is barred by the learned-profession exemption.

120. The elements of a section 75-1.1 claim are well established. Plaintiffs must prove (1) that Defendants "committed an unfair or deceptive act or practice," (2) that the unfair or deceptive act or practice was "in or affecting commerce," and (3) that Defendants' "act proximately caused injury" to Plaintiffs. *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013) (quoting *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711); *see* N.C. Gen. Stat. § 75-1.1(a). Even where these elements are present, courts have also recognized an exemption known as the learned-

profession exemption based on statutory language that places "professional services rendered by a member of a learned profession" outside the scope of section 75-1.1. N.C. Gen. Stat. § 75-1.1(b).

121. The practice of chiropractic, like the practice of medicine, should be considered a learned profession for purposes of section 75-1.1. *See Shelton v. Duke Univ. Health Sys., Inc.*, 179 N.C. App. 120, 126, 633 S.E.2d 113, 117 (2006).

122. As interpreted by our appellate courts, the learned-profession exemption is not limited to the actual delivery of professional services but extends to decision-making that affects the delivery of those services. *See* Noel L. Allen, *North Carolina Unfair Business Practice* § 14.03[4], at 14-8 (3d ed. 2017). For example, in *Cameron v. New Hanover Memorial Hospital, Inc.*, the North Carolina Court of Appeals held that the learned-profession exemption barred a section 75-1.1 claim based on the denial of hospital staff privileges to a physician. 58 N.C. App. 414, 446–47, 293 S.E.2d 901, 920–21 (1982). In reaching its holding, the court of appeals noted that "the nature of th[e] consideration of whom to grant hospital staff privileges is a necessary assurance of good health care" that "certainly" qualifies as the "rendering of 'professional services.'" *Id.* at 447, 293 S.E.2d at 921. The court also noted that the defendants "were acting in large measure pursuant to an 'important quality control component' in the administration of the hospital." *Id.* at 446, 293 S.E.2d at 920.

123. In *Abram v. Charter Medical Corp. of Raleigh, Inc.*, the court of appeals held that the learned-profession exemption barred a claim against a medical-services company that attempted to block a proposed treatment facility. 100 N.C. App. 718,

722, 398 S.E.2d 331, 334 (1991). In that case, the owners of a chemical-dependency treatment facility brought a section 75-1.1 claim against a competing operator. In applying the exemption, the court noted that the defendant medical company was "a member of the health care community." *Id.*

124. The court of appeals also applied the learned-profession exemption to bar claims in *Burgess v. Busby*, 142 N.C. App. 393, 407, 544 S.E.2d 4, 11 (2001). There, a physician distributed a letter to other medical professionals in his community with the intent to discourage them from treating the plaintiffs. *Id.* at 397, 544 S.E.2d at 6. Even though the plaintiffs' section 75-1.1 claim attacked the letter, rather than the medical treatment itself, the court of appeals held that the learned-profession exemption barred the claim because the letter was "a matter affecting the professional services rendered by members of a learned profession." *Id.* at 407, 544 S.E.2d at 11–12.

125. Here, Plaintiffs seek to avoid the learned-profession exemption on the basis that they attack HNS's business model rather than the actual chiropractic services provided by HNS members. Plaintiffs further suggest that there is a necessary inconsistency between HNS claiming on the one hand that it does not participate in the North Carolina Market for antitrust purposes, while on the other hand claiming protection under the learned-profession exemption. Plaintiffs also argue that applying the exemption to the facts here would lead to absurd results, such as granting immunity from section 75-1.1 claims to product and medical-device manufacturers in the healthcare industry.

126. Plaintiffs' arguments go too far, and if accepted, would restrict the learned-profession exemption to borders much narrower than allowed by the appellate cases discussed above. The impact of Plaintiffs' claim is to fundamentally change the marketplace in which chiropractors deliver their services and the way in which insurance companies contract for the delivery of those services to their subscribers. Plaintiffs very clearly focus on the manner in which medically necessary chiropractic care is allowed and restricted.

127. In sum, Plaintiffs' section 75-1.1 claim, for which they would otherwise have standing, must be dismissed because it is barred by the learned-profession exemption.

**(3) The Court seeks supplemental briefing and defers ruling on the issue whether Plaintiffs have adequately pleaded market power in the North Carolina Market.**

128. Defendants have renewed their challenge to the antitrust claims, including their claim that Plaintiffs have failed to allege that Defendants have market power in the relevant market. The various antitrust theories that Plaintiffs invoke in their single, broad antitrust claim each depend on market power.

129. Section 75-1 prohibits contracts, combinations, and conspiracies that restrain trade or commerce, and section 75-2 prohibits restraints of trade that violate common-law principles. N.C. Gen. Stat. §§ 75-1, -2; *see DiCesare*, 2017 NCBC LEXIS 33, at *44. Because section 75-1 is modeled after section 1 of the Sherman Act, federal decisions applying the Sherman Act are instructive in analyzing section 75-1 claims. *See Rose*, 282 N.C. at 655, 194 S.E.2d at 530; *DiCesare*, 2017 NCBC LEXIS 33, at *44.

130. Section 75-1 requires a plaintiff to allege (1) "the existence of an agreement in the form of a contract, combination, or conspiracy" that (2) "imposes an unreasonable restraint on trade." *Oksanen*, 945 F.2d at 702. Courts have developed different standards of review as to whether a contract imposes an unreasonable restraint on trade, including standards referred to as (1) per se, (2) quick-look, and (3) rule of reason. *See, e.g., N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015).

131. Plaintiffs claim that they are entitled to a per se standard of review, which would obviate the need to separately allege and prove market power. They claim that Defendants have fixed prices and participated in the Insurers' horizontal boycott of chiropractors who refuse to confine their charges to HNS's benchmark mandate. (Second Am. Compl. ¶¶ 153–54.)

132. The Court earlier left open the issue whether Plaintiffs' pleadings could support a per se violation. *Sykes I*, 2013 NCBC LEXIS 52, at *3 n.1. It now concludes that Plaintiffs must prove the claims asserted in the Second Amended Complaint under a rule-of-reason analysis. The per se standard is generally reserved for "obviously anticompetitive restraints." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002). As the United States Supreme Court cautioned, "the category of restraints classed as group boycotts should not be expanded indiscriminately," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986), particularly where "the economic effects of the restraint are far from clear," *Oksanen*, 945 F.2d at

708; *see also SiteLink Software, LLC v. Red Nova Labs, Inc.*, No. 14 CVS 9922, 2016 NCBC LEXIS 45, at \*57 (N.C. Super. Ct. June 14, 2016).

133. The intermediate quick-look standard generally applies to contracts with clear anticompetitive effects that are combined with "some procompetitive justification." *Cont'l Airlines, Inc.*, 277 F.3d at 509. The more widely used rule-of-reason standard is used to assess "restraints whose net impact on competition is particularly difficult to determine." *Id.* This is such a case.

134. A restraint-of-trade claim measured under a rule-of-reason analysis must satisfy a "threshold inquiry" as to whether the accused party has power in the relevant market. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (quoting *Valley Liquors v. Renfield Imps.*, 822 F.2d 656, 666 (7th Cir. 1987)).

135. Plaintiffs' other major antitrust theory is that Defendants have engaged in monopolistic or monopsonistic conduct in violation of section 75-2.1, which is the state analogue to section 2 of the Sherman Act. While section 1 of the Sherman Act may focus on concerted action, section 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize. *See Spectrum Sports, Inc.*, 506 U.S. at 454; *Oksanen*, 945 F.2d at 710.

136. To prevail on a section 75-2.1 claim, Plaintiffs must show "(1) the possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Oksanen*,

945 F.2d at 710 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.19 (1985)).  The same elements apply to a monopsonization claim.  *See Buccaneer Energy (USA) Inc.*, 846 F.3d at 1315.

137.  Plaintiffs seek to aggregate market power of the Insurers and HNS.  (*See* Second Am. Compl. ¶¶ 46, 78, 110.)  They allege that "[b]y virtue of its exclusive relationships with the Insurers, particularly [Blue Cross], HNS controls 100% of the HNS Market and a *materially significant* percentage of the Comprehensive Health Market, the Insurance [Health] Market and the North Carolina Market."  (*See* Second Am. Compl. ¶ 46 (emphasis added).)  They do not further define "materially significant."  Plaintiffs allege that the "Insurers control more than 50% of the relevant insurance markets including the HNS Market, the Comprehensive Health Market and the Insurance [Health] Market," (Second Am. Compl. ¶ 111,) and Blue Cross "controls 50% or more of the relevant private health insurance market in North Carolina," (Second Am. Compl. ¶ 21.)  The Court struggles in its effort to assess the adequacy of those pleadings to allege market power in the broad North Carolina Market.

138.  When considering the selling side of a market, market power is the "ability to raise prices above the levels that would be charged in a competitive market," and generally requires either direct evidence of restricted output and supracompetitive prices or indirect proof of ownership of a dominant share of the relevant market and significant barriers to market entry.  *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 381–83 (M.D.N.C. 2002); *DiCesare*, 2017

NCBC LEXIS 33, at *48–49. On the buying side of a market, market power is defined as the ability of a single buyer of a good or service "to lower input prices below competitive levels, which requires the ability to restrict the quantity demanded of the input," and results in higher output prices. Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 306 (1991).

139. Plaintiffs argue that they have clearly demonstrated proof of an output restriction on chiropractic services and are therefore entitled to the presumption that the restriction resulted from the combined market power of HNS and the Insurers, thereby shifting the burden to Defendants to disprove market power. That is, Plaintiffs argue that the Court can and should infer market power based on Plaintiffs' direct proof of "tens of millions of dollars of medically necessary care that has not been provided because of HNS's utilization management scheme." (Pls.' Br. Opp'n to Defs.' Mot. Dismiss Second Am. Compl. 13.)

140. In reaching their conclusion, Plaintiffs assert that there is proof of a direct tie between a decline in total insurance reimbursement for chiropractic services and HNS's enforcement of its benchmark mandate for average per-patient costs. They stress that those restrictions cannot be tied to medical necessity because insured chiropractic services are provided at a constant price dictated by contracts between the Insurers and HNS. They urge that such reduction accordingly inures solely to the benefit of the Insurers with no benefit to either the providers or their patients, making obvious that the reduction could be accomplished only through the exercise of market power. Plaintiffs also assert that they have clearly alleged barriers

to market entry by alleging the mere fact that Blue Cross and HNS have done business together for more than sixteen years without significant challenge from any other intermediary. (Pls.' Br. Opp'n to Defs.' Mot. Dismiss Second Am. Compl. 14.)

141. Defendants first attack Plaintiffs' underlying assumptions. They claim that other reasonable inferences preclude affording Plaintiffs the presumption that they seek. For example, Defendants stress that the Insurers' contracts, with the exception of MedCost's agreement, contain no exclusivity provisions and in no way prohibit the Insurers from contracting directly with other networks of chiropractors or with chiropractors outside of HNS's network, and that HNS's PPAs allow network members to terminate their membership in the network upon ninety days' notice for any reason. (*See* Defs.' Mot. Dismiss Am. Compl. Exs. D–G.) They also note that there are other network providers of chiropractic services.

142. While not deciding the ultimate question of whether Plaintiffs have adequately pleaded market power to survive Rule 12(b)(6), the Court does not believe that the pleadings justify a presumption that Defendants have, or can be tied to, market power in the North Carolina Market adequate to relieve Plaintiffs of their pleading burden.

143. Having now decided that the relevant market is the North Carolina Market and that Plaintiffs' claims will be governed by the rule of reason, the Court concludes that it should require supplemental briefing before it decides the issue whether Plaintiffs have adequately pleaded market power in the North Carolina

Market. Because Plaintiffs approach market power in the context of joint action by HNS and the Insurers, the Court will seek supplemental briefing in *Sykes II* as well.

### (4) Claims against the Individual Defendants

144. Defendants separately seek to dismiss all claims alleged against the Individual Defendants on the ground that Plaintiffs have not demonstrated a basis for piercing HNS's corporate veil to impose personal liability. Plaintiffs counter that they have adequately alleged that the Individual Defendants are either joint tortfeasors who knowingly and purposefully established HNS to inflict harm on Plaintiffs and to enrich themselves and the Insurers, or co-conspirators who actively participated in the wrongful antitrust conduct. (Pls.' Br. Opp'n to Defs.' Mot. Dismiss Second Am. Compl. 3–4.)

145. The Second Amended Complaint alleges a variety of individual acts from which individual liability arises, including establishing HNS in the first instance for private benefit, extracting personal benefit as a result, applying HNS's UM program indiscriminately for their own benefit, receiving preferential treatment from the Insurers, and individually participating in an illegal cartel. (Second Am. Compl. ¶¶ 27, 31, 115, 117, 155.) Plaintiffs further contend that, as HNS's owners, the Individual Defendants owed fiduciary duties to HNS members. (Second Am. Compl. ¶¶ 172–73.)

146. Defendants first contend that these allegations are too conclusory to satisfy Rule 8 of the North Carolina Rules of Civil Procedure. N.C. Gen. Stat. § 1A-1,

Rule 8(a)(1). On this issue, the Court concludes that the allegations are within the outer bounds of acceptable notice pleading.

147. As to Defendants' substantive arguments, the Court is cognizant that special rules may apply to participants in physician IPAs.

148. Generally, the doctrine of intracorporate immunity may insulate individual owners from allegations of a conspiracy based on the acts of their corporation. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 151 F. Supp. 2d 723, 731 (W.D. Va. 2001); *Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 238 (W.D. Va. 1988). However, courts have applied different rules in the IPA context. *See N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 357–58 (5th Cir. 2008) (holding that IPA action resulted from concerted action among members who controlled the IPA); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 544 (2d Cir. 1993) ("As members of an [IPA], the doctors are not staff physicians employed by the HMO . . . that is, they are not agents of the HMO. Instead, these health care professionals are independent practitioners with separate economic interests."). On the other hand, a single HMO is deemed a single entity unless a plaintiff can show that the individuals in the HMO have personal interests in the outcome of the alleged conspiracy. *See Solla v. Aetna Health Plans of N.Y. Inc.*, 14 F. Supp. 2d 252, 257–58 (E.D.N.Y. 1998), *aff'd*, 182 F.3d 901 (2d Cir. 1999).

149. The Court may later revisit the issue of individual liability through a motion for summary judgment, but the Court now concludes that claims against the

Individual Defendants survive the Motion to Dismiss to the same extent that the claims also survive against HNS.

**(5)** **Plaintiffs fail to state a claim for breach of fiduciary duty.**

150. Plaintiffs allege that HNS and the Individual Defendants pursued a joint venture with Plaintiffs and the class members and, as management of the joint venture, owe fiduciary duties to Plaintiffs and the class members. (Second Am. Compl. ¶¶ 171–72.) They allege that, in addition to their unlawful acts, Defendants breached their fiduciary duties by failing to negotiate with the Insurers for the benefit of HNS's members and failing to disclose their conflicts of interest. (Second Am. Compl. ¶ 173.)

151. A claim for breach of fiduciary duty cannot exist in the absence of a fiduciary relationship between the parties. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707. The Supreme Court of North Carolina has defined a fiduciary relationship as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). "All fiduciary relationships are characterized by 'a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party.'" *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52, 790 S.E.2d 657, 660 (2016) (quoting *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014)). While "[t]he very nature of some relationships . . . gives rise

to a fiduciary relationship as a matter of law," the list of those relationships "is a limited one," and courts "do not add to it lightly." *Id.*

152. Plaintiffs seek to impose a de jure fiduciary relationship on the ground that the HNS network is a joint venture. (*See* Second Am. Compl. ¶ 172 ("As management of the joint venture, [the Individual Defendants] and HNS owed, and owe, fiduciary duties to the Providers.").) In their PPAs with HNS, however, Plaintiffs expressly agree that no joint venture exists. (*See, e.g.*, Defs.' Mot. Dismiss Am. Compl. Ex. C, § 6.1 ("No work, act, commission, or omission of either party pursuant to the terms and conditions of this Agreement shall make or render HNS or Participant an agent, servant, or employee of, or joint venture with the other.").)

153. Even if this contract limitation were not alone adequate to defeat the joint-venture allegation, the Second Amended Complaint further lacks two essential elements of a joint venture: "(1) an agreement, express or implied, to carry out a single business venture *with joint sharing of profits*, and (2) *an equal right of control* of the means employed to carry out the venture." *Rifenburg Constr., Inc. v. Brier Creek Assocs. Ltd. P'ship*, 160 N.C. App. 626, 632, 586 S.E.2d 812, 817 (2003) (quoting *Rhoney v. Fele*, 134 N.C. App. 614, 620, 518 S.E.2d 536, 541 (1999), *aff'd*, 358 N.C. 218, 593 S.E.2d 585 (2004)). To the contrary, Plaintiffs complain of their lack of control and the unequal sharing of revenues or losses. (*See* Second Am. Compl. ¶¶ 130, 134, 173(m).)

154. In their response brief, Plaintiffs appear to shift their argument to an agency theory of fiduciary liability, claiming that HNS represented that it would act

as Plaintiffs' agent to secure the best possible deal from the Insurers. (Pls.' Br. Opp'n to Defs.' Mot. Dismiss Second Am. Compl. 15.) Plaintiffs point to HNS's contracts with the Insurers, which refer to HNS members as "Represented Providers." (*E.g.*, Defs.' Mot. Dismiss Am. Compl. Ex. E, § 1.14.) Plaintiffs argue that, because HNS members are not signatories to those agreements, "HNS must have been acting as the providers' agent in negotiating and executing those agreements." (Pls.' Br. Opp'n to Defs.' Mot. Dismiss Second Am. Compl. 16.)

155. North Carolina law is clear that "parties to a contract do not thereby become each other['s] fiduciaries; they generally owe no special duty to one another beyond the terms of the contract." *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992). The Court finds that there is no joint venture or other special relationship that arises or may be implied from HNS's contracts or the specific facts alleged in the Second Amended Complaint to give rise to a fiduciary duty. *See Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 329, 572 S.E.2d 200, 205 (2002) ("Having failed to show the elements of a joint venture, plaintiffs have necessarily failed to show the existence of a fiduciary duty to support a claim for breach of fiduciary duties."); *Synovus Bank v. Parks*, No. 10 CVS 5819, 2013 NCBC LEXIS 36, at *22–23 (N.C. Super. Ct. July 30, 2013).

156. Accordingly, Defendants' Motion to Dismiss must be granted as to Plaintiffs' fiduciary-duty claim.

**(6)** **<u>Other derivative claims survive to the same degree as the antitrust claims on which they are based.</u>**

157. Plaintiffs' remaining claims are derivative of the antitrust claims. The Court concludes that the derivative claims for declaratory judgment and civil conspiracy should survive Rule 12(b)(6) dismissal, but only to the extent that they relate to other surviving claims. *See Shope v. Boyer*, 268 N.C. 401, 404–05, 150 S.E.2d 771, 773–74 (1966) (holding that North Carolina law does not allow a freestanding claim for civil conspiracy); *accord NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co.*, Nos. 10 CVS 4392, 12 CVS 3945, 2016 N.C. Super. LEXIS 150, at \*103 (N.C. Super. Ct. Dec. 29, 2016), *appeals docketed*, No. 17-607 (N.C. Ct. App. June 16, 2017), *and* No. 17-756 (N.C. Ct. App. July 18, 2017), *and petitions for disc. rev. filed*, No. 218P17 (N.C. July 3, 2017), *and* No. 263P17 (N.C. Aug. 2, 2017).

**(7)** **<u>Punitive damages</u>**

158. A claim for punitive damages is a remedies issue. The parties did not brief the question whether antitrust violations based on sections 75-1, 75-2, and 75-2.1 provide a basis for punitive damages.

159. Generally, federal antitrust claims do not allow for punitive damages. *See, e.g.*, *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 622 (7th Cir. 2000) ("No court believes that punitive damages may be awarded for antitrust violations . . . ."). Further, Plaintiffs would not be allowed to recover both punitive damages and treble damages. *See Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996) (noting that "it is clearly improper to allow a plaintiff to recover punitive damages along with trebled damages on an antitrust claim"); *McDonald v. Johnson*

*& Johnson*, 722 F.2d 1370, 1381 (8th Cir. 1983) ("Punitive damages beyond the statutory trebled damages cannot be awarded for an antitrust violation."). In any event, this is an election-of-remedies issue that, if necessary, will be addressed at a later stage in the proceedings.

## VII.    CONCLUSION

160.    For the reasons stated in this Order & Opinion, the Court sets forth its ruling below.

(1)    Plaintiffs' Motion for Consideration of Additional Authorities is DENIED AS MOOT.

(2)    Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

i.    The motion is GRANTED to the extent that Plaintiffs seek to present antitrust claims based on a relevant market defined in the Second Amended Complaint as the HNS Market, the Insurance Health Market, or the Comprehensive Health Market;

ii.    The motion is DENIED to the extent that it seeks to dismiss the antitrust claims based on the North Carolina Market; and

iii.    Except as otherwise expressly granted, the motion is DENIED.

(3) Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART as follows:

    i. DENIED as to claims against the Individual Defendants, unless otherwise granted as to all Defendants;

    ii. GRANTED as to the portions of Plaintiffs' declaratory-judgment claim based on chapter 58 violations, and DENIED as to the other portions of that claim that derive from the antitrust claims;

    iii. DENIED as to the antitrust claims on grounds other than the issue of market power;

    iv. GRANTED as to the claim for breach of fiduciary duty;

    v. DENIED as to the civil-conspiracy claim; and

    vi. DEFERRED as to the claim for punitive damages.

(4) The parties shall each have thirty days from the date of this Order & Opinion to submit a supplemental brief regarding the adequacy of Plaintiffs' market-power allegations in the North Carolina Market. They shall have twenty days to submit a response brief. The Court does not anticipate allowing reply briefs.

SO ORDERED, this the 18th day of August, 2017.

/s/ James L. Gale
James L. Gale
Chief Business Court Judge